STATE OF NORTH CAROLINA v. RICKEY EUGENE KNIGHT

No. 110A94

(Filed 28 July 1995)

## 1. Searches and Seizures § 130 (NCI4th)— murder—search of defendant's house—knock and announce

There was no error in a first-degree murder prosecution in the admission of a pair of boots, a knife, and defendant's incriminating statement obtained as the result of a search which defendant contends was in violation of the knock and announce principle, but there was evidence that police conducted sequential searches of four residences within one block of one another during the early morning hours; the Strategic Enforcement Team made the initial entry into each house and secured it before the other officers entered and executed arrest and search warrants; defendant's residence was the last to be searched; officers were aware at the time they entered defendant's house that at least one other person involved in this murder had not been apprehended and could have been in defendant's house; the police were also aware that defendant's fiancee and two children were present and feared a hostage situation; officers knew of the brutal injuries inflicted on the victim, which they testified were indicative of overkill; they had reason to believe defendant was armed with a knife and possibly a firearm and were aware of his prior criminal record, including multiple assault and weapons charges; the actual entry occurred thirty to sixty seconds after officers knocked on the front door several times and announced "Police! Search Warrant!" at least two or three times; officers searched the residence and confiscated a pair of boots on which blood was found after defendant was arrested; and defendant was taken to the police station, where he confessed to participating in the murder and told a detective the location of one of the knives used in the murder.

**Am Jur 2d, Searches and Seizures §§ 162-170.**

**What constitutes compliance with knock-and-announce rule in search of private premises—state cases. 70 ALR3d 217.**

**2. Searches and Seizures § 135 (NCI4th)— execution of search warrant—warrant in possession of officers at scene**

There was no error in a first-degree murder prosecution where defendant contended that certain evidence was inadmissible because it was obtained as the result of an illegal search because the search warrant was not in the possession of any of the officers at the scene when the house was first entered and that the initial "once over" of the house was in reality a search for evidence rather than a sweep to ensure officer safety. The evidence showed that the search warrant was in the possession of one of the officers located at the house at the time of entry and that it was read to defendant's fiancee before any search of the house was conducted. However, even assuming that the forced entry was illegal and that the search warrant was not present immediately on the officers' entrance, the admission of the evidence did not violate defendant's constitutional or statutory rights because the police had jurisdiction to question defendant prior to the entry into his home and his confession was not the fruit of his arrest occurring in his home rather than another location, defendant did not contest the validity of the search warrant and the boots and knife were discovered as a result of the later search conducted pursuant to the warrant rather than as a direct result of the entry. The evidence was not obtained as a consequence of any violations of N.C.G.S. chapter 15A and no causal relationship between any such violations and the evidence sought to be suppressed exists.

Am Jur 2d, Searches and Seizures § 211.

**3. Evidence and Witnesses § 1278 (NCI4th)— first-degree murder—inculpatory statement—admissible**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress a statement to police and a knife obtained as a result thereof where defendant made no statement until he had been advised of his *Miranda* rights and had signed a *Miranda* rights waiver form; he responded affirmatively when he was asked if he understood his rights and wished to waive them; he was not restrained in any way, and the interrogation was conducted in an unlocked office; officers' weapons were never removed from their holsters in the presence of defendant or used to threaten him; defendant did not appear to be sleepy or under the influence of drugs or alcohol during the interrogation; he appeared to be calm, alert, and ori-

ented, did not appear to be frightened, and was able to converse freely with the officers; an officer testified that he engaged defendant in casual conversation to develop rapport, denied threatening defendant or making any promises to induce defendant's inculpatory statement, denied ever telling defendant that defendant needed to make a statement to save his life or avoid the death penalty, and denied telling defendant that he probably saved his life by confessing; another officer testified that he was present when defendant was read his *Miranda* rights and signed the waiver form; that defendant was oriented, did not smell of alcohol, and did not appear to be physically or mentally impaired; that he had engaged defendant in general conversation to develop rapport with defendant; denied threatening defendant in any way or making any promises to induce defendant's inculpatory statement; denied that defendant had been told to confess or else he would face the death penalty; and denied that defendant was told that he had probably just saved his own life by confessing; another officer testified that when defendant was arrested at his home in the early morning hours of 28 May 1992 before being taken to the police station, he was awake, oriented, and coherent; defendant's speech was not slurred, and he did not appear to be under the influence of alcohol. Upon a review of the totality of the circumstances, it is clear that defendant was not coerced or threatened into confessing his participation in this murder; and the trial court did not err in concluding that defendant freely, knowingly, and intelligently waived his *Miranda* rights and that defendant's inculpatory statement to the police was given voluntarily.

**Am Jur 2d, Criminal Law § 797; Evidence § 556.**

**Admissibility of pretrial confession in criminal case—Supreme Court cases. 113 L. Ed. 2d 757.**

**4. Criminal Law § 76 (NCI4th)— first-degree murder—pretrial publicity—motion for change of venue**

The trial court in a first-degree murder prosecution did not err by denying defendant's motion for a change of venue where defendant argued that there was extensive pretrial publicity focusing on the racial, homosexual, and mutilation aspects of the crime and the information submitted by defendant indicated that the case had been the subject of pretrial publicity which had aroused some controversy in the community, but defendant made

STATE v. KNIGHT

[340 N.C. 531 (1995)]

no showing that any of the prospective jurors would be unable to set aside this pretrial publicity and decide the case solely on the evidence presented at trial. The trial court's ruling did not prohibit defendant from renewing his motion if the actual jury *voir dire* had revealed such prejudice against him, defendant failed to use all of his peremptory challenges, and defendant made no showing during *voir dire* that it was reasonably likely that the jurors would base their decision on the pretrial publicity rather than on the information at trial. The transcript demonstrates that the actual jurors seated on defendant's jury were thoroughly questioned on their exposure to pretrial publicity and that each juror who actually sat on defendant's jury unequivocally stated that he or she could put aside any preconceived opinions as to defendant's guilt and that he or she would decide defendant's case solely upon the evidence presented in the courtroom. N.C.G.S. § 15A-957.

**Am Jur 2d, Criminal Law § 378.**

**Change of venue by state in criminal case. 46 ALR3d 295.**

**5. Criminal Law § 474 (NCI4th)— first-degree murder—jury selection—indictment not read in entirety**

Defendant was not entitled to a new trial for first-degree murder where he argued that the trial court read the bill of indictment to all the prospective and eventual jurors during jury selection. The court drew from the indictment the name of defendant, the name of the victim, the date of the crime, and the elements of the charge but did not read the indictment in its entirety and in particular did not recite the language indicating that twelve or more grand jurors had concurred in issuing the indictment. N.C.G.S. § 15A-1213 and N.C.G.S. § 15A-1221(b).

**Am Jur 2d, Trial § 187.**

**6. Jury § 137 (NCI4th)— first-degree murder—jury selection—questions regarding victim's HIV status**

The trial court did not err in a first-degree murder prosecution in a ruling which defendant contended prevented him from questioning prospective jurors about whether the victim's HIV-positive status would affect their ability to be fair and impartial. The trial court did not enter a blanket ruling prohibiting defend-

STATE v. KNIGHT

[340 N.C. 531 (1995)]

ant from asking questions about the victim's HIV status, as defendant contended, but ruled that questions about the issue of homosexuality were relevant to identify prospective jurors who might think gay bashing was permissible, stated that questions about HIV should be left out of jury selection, but deferred ruling on the line of questioning until he had a concrete question or answer before him. None of the prospective jurors mentioned any knowledge of the victim's HIV-positive status during *voir dire*, little evidence in connection with the victim's HIV-positive status was introduced at trial, and neither the State nor defendant mentioned it during opening or closing arguments. Assuming that the evidence was relevant to a prospective juror's qualifications to be fair and impartial, defendant has shown no abuse of discretion or prejudice arising to the level of fundamental unfairness from the trial court's refusal to allow him to pursue this line of questioning; the evidence of defendant's guilt was overwhelming and his attorney conceded guilt during closing arguments.

**Am Jur 2d, Jury § 275.**

**Examination and challenge of federal case jurors on basis of attitudes toward homosexuality. 85 ALR Red. 864.**

7. **Evidence and Witnesses § 1501 (NCI4th)— first-degree murder—bloody clothing of victim—admissible—use in prosecutor's argument**

The trial court did not err during a first-degree murder prosecution by admitting the victim's bloody clothes into evidence and allowing the prosecutor to brandish them before the jury during closing argument. The clothing was not excessively displayed or discussed at trial, was used to illustrate the testimony of the doctor who performed the autopsy, was not mentioned other than in chain of custody testimony after the autopsy testimony until the prosecutor made reference to it in his closing argument, and the transcript merely reflects that the prosecutor briefly displayed the clothing incident to a legitimate argument and then closed up those exhibits and continued with his closing argument.

**Am Jur 2d, Homicide § 413.**

**Admissibility, in homicide prosecution, of deceased's clothing worn at time of killing. 68 ALR2d 903.**

**8. Evidence and Witnesses § 2797 (NCI4th)— first-degree murder—prosecutor's questions—not insulting and impertinent**

There was no error in a first-degree murder prosecution where defendant contended that the prosecutor asked impertinent and insulting questions of two witnesses which could not possibly have elicited relevant evidence, but the first question was clearly relevant and nothing about the form of the question was insulting or impertinent, and the trial court sustained defendant's objection to the second and instructed the jury to disregard the question. No incompetent evidence was placed before the jury as a result of this question and there is no evidence to support defendant's assertion that this question destroyed the fundamental dignity and solemnity of the trial or led the jurors to take a flippant attitude towards defendant's guilt and this trial.

**Am Jur 2d, Witnesses §§ 743 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Mills, J., at the 3 May 1993 Mixed Session of Superior Court, Forsyth County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 April 1995.

*Michael F. Easley, Attorney General, by Thomas F. Moffitt, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally on an indictment charging him with the first-degree murder of Carlos Colon Stoner ("victim"). The jury returned a verdict finding defendant guilty as charged. During a capital sentencing proceeding, the jury was unable to unanimously agree as to its sentencing recommendation, and the trial court imposed a mandatory sentence of life imprisonment. For the reasons discussed herein, we conclude that defendant's trial was free of prejudicial error and uphold his conviction and sentence.

On the morning of 27 May 1992, the body of Carlos Stoner was discovered in Washington Park in Winston-Salem, North Carolina. The body was lying half on and half off the Greenway transversing the park.

**STATE v. KNIGHT**

[340 N.C. 531 (1995)]

Dr. Patrick Lantz, the county medical examiner, performed an autopsy on the victim's body. He testified that the victim had been stabbed more than twenty-seven times and that a number of his wounds would have been individually fatal. There was a stab wound at the base of the victim's skull extending into his brain stem, which Dr. Lantz believed had been inflicted prior to the victim's death. Dr. Lantz testified that the victim's heart was still beating at the time this wound was inflicted based on the amount of bleeding near the wound. This wound would have incapacitated the victim although his heart could have continued beating for a period of several minutes after the wound was inflicted.

The victim also had a very large gaping wound in his chest, approximately seven inches by three inches, where his rib cage had been split open. This wound exposed the victim's heart and right lung. Dr. Lantz testified that the victim had likely been alive when he received this wound and could have lived up to five minutes after it was inflicted.

Several other wounds penetrated the victim's lungs and the space surrounding his heart. According to Dr. Lantz these smaller wounds would have leaked blood slowly. Death from these wounds would have taken anywhere from a matter of minutes to possibly more than an hour after they were inflicted.

The victim's penis had been severed from his body and inserted into his mouth. Dr. Lantz testified that this castration occurred at or near the time of the victim's death.

The autopsy further revealed that the victim had a blood alcohol level of 280 milligrams per deciliter (.28). The victim was HIV-positive.

Dwayne Doby ("Doby") testified against defendant at trial. The State's evidence tended to show that on the evening of 26 May 1992, Doby was at a party on Academy Street in Winston-Salem. According to Doby he was standing in the yard of Wendy Britton's home on Academy Street with a group of people including defendant and Mark Smith. The men were drinking beer when the victim walked past them. The victim was drunk and shouting. Smith hollered at the victim and told him to be quiet. The victim rolled up his sleeves and said he was going to "whup [sic] somebody's a—." Doby testified that he did not see the victim fight anyone and that he did not see anyone

strike the victim at that time. Smith walked over to where the victim was standing and talked with him for a while.

After Smith returned to the party, the victim again began shouting at the people at the party. Smith and defendant went across the street to where the victim was standing. The men shouted at each other for a while, and then the victim was invited to come have a drink at the party. The victim drank part of a beer and was asked to leave the party. The victim then walked up Academy Street to the Circle K.

Doby testified that as the victim was walking away from the party, Andrew Gilbert arrived at the party. Shortly thereafter, Smith approached Doby and asked him to drive Smith, Gilbert, and defendant up the road to pick up the victim. The men planned to beat up the victim in a local park. Doby got in the front seat of his truck, and the other men got in the back. Doby drove to the Circle K. Smith got out of the truck and talked to the victim, who agreed to go off with the other men. The victim got in the passenger side of the truck, and the men drove to another local store to buy beer. At this time the victim tried to get out of the truck, but defendant had his hand on the victim's shoulder and told him to get back in the truck.

Doby drove his truck to the Greenway in Washington Park. Doby drove down the Greenway to a clearing, turned around, and parked on the pathway facing out of the park. When he turned the truck lights off, he was still able to see what was going on outside the truck. He testified that the area was well lit from nearby streetlights, the moon, and lights from a Duke Power supply lot located across the street from the park. Doby testified at trial that he could see all the other persons present, the path, and the clearing where the truck was parked.

After he parked the truck, Doby got out and walked around to the back of the truck. Gilbert told Doby to get back in the truck. The victim had not yet exited the truck, and Doby heard defendant ask him to do so. Doby testified that the victim was visibly drunk and difficult to understand. The victim stepped out of the truck and put his hands on the side of the truck. Defendant told the victim to step away from the truck; and when he refused, defendant hit him in the jaw. Defendant elbowed him in the chest, and the victim started to fall. Gilbert had a knife in his hands and started stabbing the victim. Doby saw Gilbert make several slashing motions and heard Gilbert claim that he had stabbed the victim three times before he hit the ground. Smith kicked and beat on the victim after he had fallen to the ground.

Once the attack started, Doby heard the victim grunt a few times; and then he was quiet.

After this initial attack on the victim, Smith and Gilbert got back in the truck; and Doby rolled it approximately fifteen feet down the Greenway. Defendant continued to beat on the victim and asked Gilbert for the knife. Doby saw defendant stab the victim repeatedly before returning to the truck. When he returned to the truck, defendant claimed he had stabbed the victim thirteen or fourteen times with the knife. Doby saw defendant wipe the blood off his hands and the knife with the victim's hat. Gilbert threw the knife out of the truck during the trip back to the party on Academy Street. The men made a pact not to tell anyone about the murder.

Approximately one hour later, defendant asked Doby for a ride to defendant's house. Defendant went inside and retrieved a hunting knife, which was approximately eleven inches long. He asked Doby to drive him back to the Greenway so he could make sure the victim was dead. Doby drove defendant back to Washington Park and dropped him off. Doby circled the block twice and then picked defendant up on Broad Street. At that time he noticed that defendant had a great deal of blood on his hands. Defendant still had the knife with him.

Defendant got into the truck and told Doby that the victim had still been alive. Doby testified that defendant told him that the victim had been asking for help and that he had kicked the victim in the head. Next, defendant claimed he took his knife and stuck it in the victim's neck and twisted it, a trick his father had learned in Vietnam. Defendant told the victim, "[F]— you, n——. You don't deserve help." Then, he cut open the victim's rib cage. Next, he cut off the victim's penis and inserted it into the victim's mouth.

Defendant told Doby that he did not feel anything and that he did not care for the man he just killed. He asked Doby if he "wanted to go back and kill another one the next night."

The men returned to the party and made another pact with Gilbert and Smith not to say anything about the murder. Gilbert threatened Doby and told the group that he would kill anyone who said anything about the murder. Doby told the police he had never met defendant and Gilbert before the night of the murder and that he was frightened of them.

Doby was extremely upset when he returned home at approximately 4:00 a.m. He told his fiancée he had just witnessed a murder.

Several hours later she called her mother, who convinced Doby to talk with the police. He spoke with the police late on the afternoon of 27 May 1992 and made a full statement about his participation in the murder. In this statement Doby indicated that defendant was the most culpable participant in the crime and told the police he thought defendant was armed with a knife and might have a cache of weapons inside his home.

At approximately 4:00 a.m. on 28 May 1992, the police entered defendant's residence to conduct a search of the premises and arrest defendant. The search revealed a pair of boots that were later determined to have blood on them.

Defendant was arrested and taken to the police station. After being given his *Miranda* warnings, defendant confessed to his participation in this murder. In this confession defendant claimed he did not intend to kill the victim when he took him to the park, that he did not check the victim to determine if he was alive when he returned to the park for the second attack, and that he did not castrate the victim. After making this statement to the police, defendant told them where the knife used in the second attack was located and called his fiancée to get it from their couch for the police.

Mark Smith also testified against defendant at trial. Smith's testimony about the events surrounding the murder basically corroborated Doby's testimony. Smith testified that when the men left the party to pick up the victim, he heard defendant say, "I've never killed a n——— before. I want to see what it's like."

Defendant's evidence tended to show that he was so intoxicated the night of the murder that he could not premeditate and deliberate at the time of the crime. Tommy McGee testified that he spent most of the afternoon of 26 May 1992 and the early morning hours of 27 May 1992 with defendant, who consumed a large amount of beer during that time period. McGee testified that the two men drank two twelve-packs of beer during that afternoon and that he saw defendant drink eight to twelve more beers at the party on Academy Street. At the party defendant was talking loudly, slurring his speech, and leaning on a tree for balance.

Pamela McGrew ("McGrew") testified that she was defendant's fiancée and the mother of his two children. She testified that defendant had been drinking all day on 26 May 1992 from about 10:00 a.m. According to McGrew defendant did not have anything to eat on the

STATE v. KNIGHT

[340 N.C. 531 (1995)]

day of the murder. She testified that prior to the party on Academy Street, defendant was visibly drunk, had bloodshot eyes, smelled of alcohol, and bumped into furniture. She testified that at the party, defendant was stumbling, had red eyes, smelled strongly of alcohol, and was talking loudly and profanely.

McGrew saw the four men leave the party shortly after the victim departed; she thought the men were going out to purchase more beer for the party. Approximately twenty-five minutes later, they returned to the party. McGrew claimed that defendant was wobbly, had bloodshot eyes, and smelled of alcohol at that time. She saw defendant leave the party a second time and return approximately fifteen minutes later. McGrew admitted that defendant was accustomed to drinking large quantities of beer and that the amount he consumed on 26-27 May 1992 was not unusual for him although the amount he drank that night was beyond his normal pattern.

Defendant's evidence also tended to show that the victim was dead when defendant returned to Washington Park for the second attack on the victim. Dr. Page Hudson, former Chief Medical Examiner for North Carolina, testified for defendant as an expert in forensic pathology. Dr. Hudson opined that the victim was already dead when his penis was severed from his body based on his review of the autopsy report indicating semen emission and little blood loss associated with that wound. He testified that one of the wounds penetrated the victim's liver and would have killed the victim in minutes to hours if left unattended. He testified that although the victim may have been alive when he suffered the wound to the base of his neck, he could equally possibly have been dead at that time. He based this opinion on the theory that the blood pooled around the wound could have been the result of hydrostatic pressure after death rather than pressure exerted by a beating heart. He further testified that the massive chest wound would have been sufficient to kill the victim and that the other wounds to the heart and lungs were life-threatening but not immediately fatal.

Defendant presented evidence tending to contradict Doby's testimony and statements to the police. Defendant presented evidence that contrary to Doby's testimony, the moon was not full the night of the murder and would not have provided enough moonlight to allow a person to see well in the dark. Darrell Wilson, a private investigator, testified that he went to the murder scene at night and found no artificial light illuminating the area. Mark Miller testified that while he

was in the Forsyth County jail on 18 September 1992, Dwayne Doby told him that he was facing life imprisonment for "cutting a man's dick off and putting it in his mouth."

In his closing argument defendant's attorney conceded that defendant was guilty of second-degree murder in this case but not first-degree murder.

Defendant did not testify during the guilt phase of this trial.

Additional facts will be presented as necessary for the discussion of specific issues.

[1]    Defendant first contends the trial court erred in denying his motion to suppress his boots, knife, and incriminating statement which were obtained as the result of an illegal and unconstitutional forced entry, search, and arrest at his residence on 28 May 1992, in violation of the "knock and announce" principle.

In *Wilson v. Arkansas,* —— U.S. ——, 131 L. Ed. 2d 976 (1995), the United States Supreme Court held that the "common law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." *Id.* at——, 131 L. Ed. 2d at 977. In *Wilson,* the Court indicated that although failure to comply with the "knock and announce" principle may render a search or seizure of a dwelling unconstitutional, countervailing law-enforcement interests may establish the reasonableness of an entry conducted in violation of this principle. *Id.* at ——, 131 L. Ed. 2d at 979.

The North Carolina "knock and announce" priciple was set forth in *State v. Sparrow,* 276 N.C. 499, 512, 173 S.E.2d 897, 905 (1970), in which this Court stated:

> Ordinarily, a police officer, absent invitation or permission, may not enter a private home to make an arrest or otherwise seize a person unless he first gives notice of his authority and purpose and makes a demand for and is refused entry. Without special or emergency circumstances, an entry by an officer which does not comply with these requirements is illegal.

*See also State v. Covington,* 273 N.C. 690, 698, 161 S.E.2d 140, 146 (1968) (holding that in the absence of hostile action from within the house, entrance must be demanded and denied before a forcible entry is lawful when there is neither a search nor an arrest warrant for the defendant). This common-law principle has been codified in N.C.G.S.

§ 15A-251, which requires the police to comply with the "knock and announce" principle to execute a search warrant in a private residence in the absence of a danger to human life, and in N.C.G.S. § 15A-401(e)(1) and (2), which require compliance with the "knock and announce" principle to execute an arrest warrant on private property in the absence of probable cause to believe that compliance would endanger human life.

Defendant contends that in this case, the police had no cause to believe that compliance with the "knock and announce" principle would endanger human life. He argues that even though the Winston-Salem police officers were acting pursuant to valid search and arrest warrants, this forced entry into his home at 4:00 a.m. violated his constitutional rights to be free from unreasonable searches and seizures as well as his statutory rights pursuant to N.C.G.S. §§ 15A-251 and 15A-401(e)(1) and (2). He argues that all the evidence discovered as a result of this illegal forced entry into his home was required to be suppressed by N.C.G.S. § 15A-974 and that the trial court erred as a matter of law by denying his pretrial motion to suppress this evidence. We reject defendant's arguments for the following reasons.

The scope of appellate review of a denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

A careful review of the record reveals that in the instant case, unlike in *State v. Sparrow*, exigent circumstances existed justifying the forced entry of the Winston-Salem police officers into defendant's residence after notification and a brief delay. The evidence presented during the *voir dire* tended to show the following.

During the early morning hours of 28 May 1992, the police conducted sequential searches of four residences located within one block of one another in Winston-Salem. The Strategic Enforcement Team ("S.E.T.") made the initial entry into each house and secured it before the other officers were allowed to enter and execute arrest and search warrants. Defendant's residence was the last of these four houses to be searched; and at the time the officers entered his residence, they were aware that at least one other person involved in this murder had not yet been apprehended and could have been present in

defendant's home. The police were also aware that defendant's fiancée and the couple's two children were present in the home and feared a possible hostage situation unless they entered defendant's residence quickly.

At the time the police entered the residence, they knew of the brutal injuries inflicted on the victim. The police knew that the victim had been stabbed over twenty-seven times, including a deep wound to the back of the neck and an extensive wound in his chest that exposed his heart and his right lung. Additionally, the victim had been castrated and his penis inserted into his mouth. Several officers testified that the brutality of this murder was indicative of "overkill."

Based on Doby's statement, the police knew that after the initial attack, defendant returned to the murder scene to ensure the victim was dead. According to Doby, the victim was not dead when defendant returned for the second attack. At that time defendant stabbed the victim in the back of the neck, split his chest open, and castrated him.

Further, based on Doby's statement, the police had reason to believe that the defendant was armed with a knife and possibly a firearm. Doby had informed the police that he thought defendant had a cache of weapons inside his home and that defendant had told Doby that the people around him were always armed. The police were aware of defendant's prior criminal record, which included eight charges of carrying a concealed weapon, six charges of assault on a female, and other assaults including misdemeanor assault with a deadly weapon.

The actual entry into defendant's residence occurred after the S.E.T. knocked on the front door several times and announced, "Police! Search Warrant!" at least two or three times. After waiting thirty to sixty seconds and hearing no response from inside the residence, the police used a battering ram to open the door. Officers entered the premises, conducted a quick sweep of the residence to look for weapons, and placed defendant under arrest. After defendant was arrested, officers searched the residence and confiscated a pair of defendant's boots, which were later determined to have traces of blood on them.

Defendant was taken to the police station, where he confessed to his participation in the murder of Carlos Stoner to Detectives Young and Peddle. After making this confession, defendant told Detective Young that one of the knives used in the murder was located in his

STATE v. KNIGHT

[340 N.C. 531 (1995)]

couch. Defendant contacted his fiancée, McGrew, who let Detective Chapple into the house and gave him the knife.

Based on our review of the evidence presented at the *voir dire* on defendant's motion to suppress, we conclude that there was competent evidence to support the trial court's findings of fact that "[i]t was reasonable to believe . . . that the defendant was a dangerous person and probably armed with at least a hunting knife and possibly firearms"; that "the officers were appropriately and legitimately concerned about their own safety"; that "there was still at least one other suspect, other than the defendant, who had not been arrested"; that "it was possible" this other suspect was at defendant's house; that "the officers were legitimately concerned for the safety of Miss McGrew and the two children in safely effecting the defendant's arrest"; that "[t]here was some legitimate concern that a hostage situation might be created if they did not act promptly"; and that "[i]t had been the understanding of several of the detectives involved that the entry should be and would be quick and safe. They had serious concerns that if the entry was not forced, it would not be safe."

These findings of fact are binding on this appeal and support the trial court's conclusions of law that although the police officers gave appropriate notice of their identity and purpose, they had probable cause to believe that further delay in entering defendant's residence or the giving of specific notice from outside the house to defendant that he was being placed under arrest would endanger their own safety as well as the safety of the other occupants of the house. The trial court did not err in concluding that the forced entry into the house did not violate any of defendant's constitutional rights or any of the provisions of chapter 15A of the North Carolina General Statutes. Under the totality of the circumstances, the entry into defendant's house was reasonable. On this basis the trial court did not err in admitting into evidence defendant's boots, his confession, and his knife.

[2] Defendant further contends that the challenged evidence was inadmissible because it was obtained as the result of an illegal search after entry into his house. Defendant contends that the search warrant was not in the possession of any of the officers at the scene when the house was first entered and that the initial "general once-over of the entire house and the cabinets" was in reality a search of defendant's house for evidence rather than a sweep of the residence to ensure officer safety. Defendant argues that in violation of N.C.G.S.

§ 15A-252, the search warrant was not read to McGrew until ten minutes after the police entered the residence at which time the search for evidence had already been conducted. He claims that it is immaterial that nothing was seized before the warrant was read to McGrew and that the trial court erred in denying his motion to exclude all the evidence discovered as a result of this substantial violation of this statute pursuant to N.C.G.S. § 15A-974(2). We disagree.

The evidence presented at the pretrial hearing tended to show that the search warrant for 1138 Bank Street was in the possession of one of the officers located at defendant's house at the time of entry and that it was read to McGrew before any search of defendant's home was conducted. Detective Best testified that he was present during the initial entry into the residence by the members of the S.E.T. and entered the residence after it was secured by those officers. After being inside the residence approximately one minute, he returned to the front yard and obtained the search warrant from either Lieutenant Culler or Sergeant Newsome, the officers in charge of the search of defendant's residence. According to Best there was a different search warrant package for each of the searches being conducted that morning, and the supervisor for each location had the search warrant for that location. He testified that he reentered the residence, stood in the hall, and read the search warrant aloud in a voice anyone in the house could hear. Best testified that at that time, he was within five to ten feet of both defendant and McGrew, who appeared to be in control of the premises. Best also testified that no search of the premises was conducted until after the search warrant was properly executed.

Sergeant Newsome testified that he was responsible for three of the search warrant packages that night. He testified that after the searches were initiated, he went to each location to see how the searches were progressing. Although he was not present when the S.E.T. entered defendant's residence, Newsome testified that the search warrant for that location was in the possession of one of the officers present on the scene at the time of entry, most probably Lieutenant Culler. Newsome testified that he arrived at defendant's residence approximately ten minutes after the initial entry into the residence and that when he arrived, Detective Best was reading the final portion of the search warrant to the occupants of the house. Sergeant Newsome testified that the search warrant was read prior to the actual search of the premises being conducted and prior to any evidence being seized.

Officer Nelson testified that he was the first member of the S.E.T. to enter defendant's residence. Although he did not have the search warrant in his possession, he testified that another officer had it in his possession. He testified that the members of the S.E.T. secured the premises and conducted a sweep of the residence to look for weapons that could be used against them. He testified that it takes approximately a minute to secure a residence after entry.

Based on our review of the evidence in the record, we conclude that there was competent evidence to support the trial court's findings of fact that the search warrant was on the premises when the police entered defendant's residence on 28 May 1992 and that it was read to McGrew before any search was undertaken in the house. The trial court did not err in concluding that the execution of the search warrant did not violate any provisions of chapter 15A and in admitting at trial the evidence obtained as a result of the search of defendant's residence. This evidence was not required to be excluded pursuant to N.C.G.S. § 15A-974(2).

Even assuming *arguendo* that the forced entry into defendant's residence to execute the warrants was illegal and that the search warrant was not present on the premises immediately upon the officers' entrance into the defendant's residence, we conclude that admission of the evidence at issue did not violate defendant's constitutional or statutory rights.

In *New York v. Harris*, 495 U.S. 14, 109 L. Ed. 2d 13 (1990), the United States Supreme Court held that even when the police conducted an illegal warrantless entry into a defendant's home to arrest him, his later confession at the police station was not required to be suppressed as a fruit of that illegal entry as long as the statement was not the product of defendant's being in unlawful custody. Since the police had probable cause to arrest him before the illegal entrance was made, the police had a justification to question him prior to the arrest; hence, his confession was not an exploitation of the illegal entry, and the confession was not the result of being arrested in the defendant's home instead of at another location. *Id.* at 19-20, 109 L. Ed. 2d at 21-22.

In the instant case, even if the initial entrance into defendant's residence was illegal, his later confession was not the product of being in unlawful custody. The police had probable cause to arrest defendant and were acting pursuant to a valid warrant for his arrest when they entered his residence. Defendant was properly notified of

his *Miranda* rights and waived them. Based on Doby's statement to the police about this murder, the police had justification to question defendant prior to the entry into his home. Finally, defendant's confession was not the fruit of the fact that his arrest occurred in his home rather than at another location. Assuming *arguendo* that the entry into defendant's residence was illegal, the admission of defendant's confession and the knife obtained as a result thereof into evidence did not violate defendant's constitutional right to be free from unreasonable searches and seizures.

In *Segura v. United States*, 468 U.S. 796, 82 L. Ed. 2d 599 (1984), the United States Supreme Court held that although an illegal entry into a defendant's residence to prevent the destruction of evidence rendered inadmissible any evidence discovered as a direct result of the illegal entry, the illegal entry and securing of a defendant's residence from within for over nineteen hours while waiting for a valid search warrant to arrive did not render the seizure of the residence unreasonable or taint the evidence later discovered pursuant to the valid search warrant if the search warrant and the information upon which it was based were independent of and unrelated to the illegal entry. *Id.* at 811, 82 L. Ed. 2d at 613.

In the instant case, even if the police officers illegally entered the home and conducted the initial sweep of the residence for weapons while waiting for the search warrant to arrive, under *Segura* this conduct did not constitute an unreasonable seizure requiring the evidence consisting of defendant's boots, his confession, and his knife to be excluded at trial. Defendant does not contest the validity of the search warrant in this case. The search warrant and the information upon which it was based were totally unrelated to the police entry into defendant's residence. The information supporting the warrant was provided by Doby's statement, and the warrant was issued more than an hour before the entry into defendant's residence occurred.

The evidence at issue was not discovered as a direct result of the entry but as a result of the later search conducted pursuant to the valid search warrant. As indicated above, there was sufficient competent evidence to support the trial court's finding of fact that the search warrant was read to McGrew prior to any search of defendant's residence. The boots were not examined or seized until after the search warrant was properly executed, and the knife was not discovered until several hours later.

The delay of ten to fifteen minutes between the time the officers entered the residence and the time the warrant allegedly arrived was not as extensive as the nineteen-hour delay before the warrant arrived in *Segura,* and the evidence in the instant case clearly supports the trial court's finding that the officers only conducted a sweep of the house for weapons and other persons before the warrant was executed. Admission of the evidence consisting of defendant's boots did not violate defendant's rights to be free from unreasonable searches and seizures.

N.C.G.S. § 15A-974(2) requires exclusion of evidence obtained as a result of a substantial violation of chapter 15A of the North Carolina General Statutes. For evidence to be excluded under this statute, there must be a causal relationship between the violation and the evidence sought to be suppressed. *State v. Hunter,* 305 N.C. 106, 113, 286 S.E.2d 535, 539 (1982). The evidence at issue was not obtained as a consequence of any violations of chapter 15A, and no causal relationship between any such violations and the evidence sought to be suppressed exists in the instant case. Therefore, the evidence at issue was not required to be suppressed pursuant to this statute.

[3] Next, defendant contends that the trial court erroneously denied his motion to suppress his 28 May 1992 statement to the police about his involvement in this murder in violation of his constitutional right against compulsory self-incrimination as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. He argues that the trial court erred by concluding that defendant knowingly and voluntarily waived his constitutional rights before making his statement to the authorities and that both his confession and the hunting knife obtained as a result thereof should have been excluded.

Defendant argues that the following circumstances rendered his inculpatory statement and *Miranda* waiver involuntary and unknowing: (i) the physical circumstances surrounding his interrogation by the police were coercive; (ii) the police officers made coercive threats to induce his confession; (iii) the police officers conducting his interrogation engaged in coercive techniques to induce his confession; and (iv) defendant did not understand his constitutional rights. Defendant had a limited educational background; and at the time of the interrogation, he was frightened and his mental acuity was diminished by alcohol consumption. We disagree.

The voluntariness of defendant's statement must be determined by looking to the totality of the circumstances surrounding the statement. *State v. Mlo*, 335 N.C. 353, 363, 440 S.E.2d 98, 102, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 841 (1994); *State v. Hicks*, 333 N.C. 467, 482, 428 S.E.2d 167, 176 (1993). Some of the factors to be considered include (i) whether defendant was in custody, (ii) defendant's mental capacity, (iii) the physical environment of the interrogation, and (iv) the manner of the interrogation. *State v. Hicks*, 333 N.C. at 482-83, 428 S.E.2d at 176. The State bears the burden of proving that a defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary. *State v. Reid*, 335 N.C. 647, 440 S.E.2d 776 (1994). Only if all the evidence tends to show that police investigators made promises or threats to a defendant whose confession is the product of hope or fear generated by such promises or threats will a confession be ruled involuntary as a matter of law. *State v. Chamberlain*, 307 N.C. 130, 143-44, 297 S.E.2d 540, 548 (1982).

The trial court held a *voir dire* to determine the admissibility of the defendant's statement, and its findings of fact after such a hearing are conclusive and binding on this Court if they are supported by competent evidence even though the evidence is conflicting. *State v. Simpson*, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985). We conclude that the evidence presented at the pretrial hearing on defendant's motion supported the trial court's findings of fact and that none of the trial court's conclusions of law based on those findings were erroneous.

Detective Young testified that he and Detective Peddle interviewed defendant at approximately 5:30 a.m. on 28 May 1992 at the Winston-Salem police station. Defendant made no statement until he had been advised of his *Miranda* rights and had signed a *Miranda* rights waiver form. Defendant responded affirmatively when he was asked if he understood his rights and wished to waive them. Defendant was not restrained in any way, and the interrogation was conducted in an unlocked office. Although the officers may have had their weapons in their holsters, these weapons were never removed in the presence of defendant or used to threaten him. Defendant did not appear to be sleepy or under the influence of drugs or alcohol during the interrogation; rather, he appeared to be very calm, alert, and oriented. Defendant did not appear to be frightened and was able to converse freely with the officers.

Young testified that he engaged defendant in casual conversation to develop rapport. Young testified that defendant stated that he did

not know what the big deal was because it was "just another dead n———." Young informed defendant that he was charged with murder. Defendant asked Young several times what that meant; and Young explained that defendant would be tried for murder and, in the worst-case scenario, could face the death penalty. He asked defendant if he wanted to tell his side of the story and told defendant that he was willing to listen. When defendant made no response, the detectives started to leave the room. At that time defendant stopped them and indicated he wished to tell them his version of the story. At approximately 6:00 a.m. defendant confessed to his participation in the murder of Carlos Stoner.

Young denied threatening defendant or making any promises to induce defendant's inculpatory statement. He denied ever telling defendant that defendant needed to make a statement to save his life or avoid the death penalty. He also denied telling defendant that he probably saved his life by confessing. Young denied telling defendant that this murder "will be the one they'll fire up the electric chair for."

Young testified that after defendant made a taped statement, he asked defendant where the knife used in the murder was located. Defendant told him it was inside his couch at home and that if he could call his fiancée, he would tell her to get it for the police. Defendant made the phone call, and Young notified Detective Chapple to return to defendant's house to retrieve the knife.

Peddle testified that he was present when defendant was read his *Miranda* rights and signed the waiver form. He testified that defendant was oriented, did not smell of alcohol, and did not appear to be physically or mentally impaired. He engaged defendant in general conversation to develop rapport with defendant. Peddle denied threatening defendant in any way or making any promises to induce defendant's inculpatory statement. He denied that defendant had been told to confess or else he would face the death penalty. He denied that after making his statement, defendant was told that he had probably just saved his own life by confessing.

Chapple testified that when defendant was arrested at his home in the early morning hours of 28 May 1992, he was awake, oriented, and coherent. Defendant's speech was not slurred, and he did not appear to be under the influence of alcohol. Chapple testified that at approximately 6:00 a.m., he returned to defendant's house and was given a large knife by McGrew.

STATE v. KNIGHT

[340 N.C. 531 (1995)]

Defendant testified that he was scared and nervous but that he signed the *Miranda* waiver form and confessed because he thought it would save his life. He admitted that the contents of the statement were true. Defendant further admitted that he had not consumed any alcohol for six hours prior to his interrogation. He acknowledged that he understood the terms in the *Miranda* waiver and that he signed the form. Although defendant testified that he dropped out of school in the ninth grade, he was able to read the *Miranda* form in court without difficulty. He admitted that no weapons were drawn on him during the interrogation and that Young's alleged statement that defendant's confession would probably save his life was made after his confession had been recorded.

Based upon our review of the motions transcript, we conclude that the trial court's factual findings were supported by substantial competent evidence and are binding on this appeal. Upon a review of the totality of the circumstances, it is clear that defendant was not coerced or threatened into confessing his participation in this murder; and the trial court did not err in concluding that defendant freely, knowingly, and intelligently waived his *Miranda* rights and that defendant's inculpatory statement to the police was given voluntarily. Defendant's confession and the hunting knife obtained as a result thereof were properly admitted into evidence at trial. This assignment of error is overruled.

[4] Next, defendant argues that the trial court erroneously denied his pretrial motion for a change of venue. In support of his motion, defendant argued that there was extensive pretrial publicity focusing on the racial, homosexual, and mutilation aspects of the crime. In support of his argument, defendant submitted twenty-five newspaper articles discussing the case, telecast summaries from two local television stations, and affidavits from four attorneys in Forsyth County. The State asked the trial court to deny the motion until the jury selection process was under way in order to be better able to determine at such time if it would be possible to pick a jury that would give defendant a fair trial in Forsyth County. Accordingly, the trial court denied defendant's pretrial motion for a change of venue. Defendant did not renew this motion after jury selection.

Defendant contends that because the trial court denied his pretrial motion without making any findings of fact or conclusions of law, it is impossible to determine if the trial court applied the correct legal standard. Defendant further argues that the trial court's ruling

was erroneous as a matter of law and violated his constitutional right to due process of law. We reject defendant's arguments for the following reasons.

The statute pertaining to change-of-venue motions provides:

> If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:
>
> (1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or
>
> (2) Order a special venire under the terms of G.S. 15A-958.

N.C.G.S. § 15A-957 (1988).

The test for determining whether pretrial publicity mandates a change of venue is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." *State v. Jerrett*, 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983). Defendant has the burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial in that county on account of prejudice from such pretrial publicity. *State v. Madric*, 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). To meet this burden defendant

> must show that jurors have prior knowledge concerning the case, that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury. In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial.

*State v. Jerrett*, 309 N.C. at 255, 307 S.E.2d at 347-48 (citations omitted). The determination of whether a defendant has carried his burden of showing that pretrial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. *State v. Madric*, 328 N.C. at 226, 400 S.E.2d at 33.

"Only in the most extraordinary cases can an appellate court determine solely upon evidence adduced prior to the actual commencement of jury selection that a trial court has abused its discretion by denying a motion for change of venue due to existing prejudice against the defendant." *Id.* at 227, 400 S.E.2d at 34. The existence of pretrial publicity by itself does not establish a reasonable likelihood that defendant cannot receive a fair trial in the county where the crime was committed. *State v. Soyars*, 332 N.C. 47, 53, 418 S.E.2d 480, 484 (1992).

After reviewing the information submitted by defendant in support of his pretrial motion for change of venue, we conclude that the trial court did not err in concluding that defendant had not made a sufficient showing of prejudice. While the information submitted by the defendant indicated that this case had been the subject of pretrial publicity which had aroused some controversy in the community, defendant made no showing that any of the prospective jurors in Forsyth County would be unable to set aside this pretrial publicity and decide this case solely on the evidence presented at trial.

The trial court was not required to make findings of fact or conclusions of law in connection with the denial of this pretrial motion. The transcript clearly shows that the trial court's ruling did not prohibit defendant from renewing this motion if the actual jury *voir dire* had revealed such prejudice against him.

A review of the actual *voir dire* of prospective jurors reveals that the trial court did not err by denying defendant's pretrial motion for change of venue. First, defendant failed to use all of his peremptory challenges. When the actual jury was seated, defendant still had one unused peremptory challenge remaining. Further, defendant made no showing during this *voir dire* that it was reasonably likely that the jurors in his case would base their decision on the pretrial publicity rather than on the information presented at trial.

This Court has previously noted that the potential jurors' responses to questions on *voir dire* are the best evidence of whether pretrial publicity was prejudicial or inflammatory. *State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). If each juror states unequivocally that he or she can set aside pretrial information about a defendant's guilt and arrive at a determination based solely on the evidence presented at trial, the trial court does not err in refusing to grant a change of venue. *State v. Moore*, 335 N.C. 567,

586, 440 S.E.2d 797, 808, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994).

In the instant case the transcript demonstrates that the actual jurors seated on defendant's jury were thoroughly questioned on their exposure to pretrial publicity. The transcript further shows that each juror who actually sat on defendant's jury unequivocally stated that he or she could put aside any preconceived opinions as to defendant's guilt and that he or she would decide defendant's case solely upon the evidence presented in the courtroom. Although, as defendant contends, some prospective jurors were somewhat equivocal, during the entire jury *voir dire*, only two indicated that they definitely had formed opinions about the case based on pretrial publicity and could not decide the case based on the evidence. None of these people remained on the jury, however.

As defendant has failed to meet his burden of proof necessary to prevail on this issue, we reject his argument and overrule this assignment of error.

[5] Next, defendant argues that he is entitled to a new trial because the trial court erroneously read the bill of indictment to all the prospective and eventual jurors during jury selection, in violation of N.C.G.S. § 15A-1213 and N.C.G.S. § 15A-1221(b). N.C.G.S. § 15A-1221(b) provides that "at no time during the selection of the jury or during trial may any person read the indictment to the prospective jurors or to the jury." N.C.G.S. § 15A-1221(b) (1988). N.C.G.S. § 15A-1213 prohibits the trial judge from reading the pleadings to the jury. N.C.G.S. § 15A-1213 (1988).

Defendant's murder indictment alleged that "on or about [27 May 1992] and in [Forsyth County] the defendant [Rickey Eugene Knight] unlawfully, willfully and feloniously and of malice aforethought did kill and murder Carlos Colon Stoner." At the start of jury selection, the trial court addressed all the prospective jurors as follows:

> This is a case which we're beginning to select the jury on entitled the State of North Carolina against Rickey Eugene Knight. Rickey Eugene Knight is charged in a bill of indictment that on or about the 27th of May 19 hundred and 92 here in Forsyth County, he did unlawfully, wilfully and feloniously and of malice aforethought kill and murder Charles [sic] Colon Stoner. And that's a charge of first degree murder.

STATE v. KNIGHT

[340 N.C. 531 (1995)]

After the initial panel of prospective jurors was exhausted, the trial court called a second panel into the courtroom and addressed these potential jurors in a similar fashion. Defendant did not object at trial to either comment.

N.C.G.S. § 15A-1221(a)(2) requires the trial court to inform prospective jurors about the case in accordance with section 15A-1213. N.C.G.S. § 15A-1213 requires the trial court to identify the parties and their counsel and briefly inform the prospective jurors of the name of the defendant, the charge, the date of the alleged offense, the name of the victim as alleged in the pleadings, defendant's plea, and any affirmative defense of which defendant has given proper notice. "To comply with these requirements, the trial court may draw 'information from the bills of indictment to the extent necessary to identify the defendant and explain the charges against him and the circumstances under which he was being tried.' " *State v. Faucette*, 326 N.C. 676, 689, 392 S.E.2d 71, 78 (1990) (quoting *State v. Leggett*, 305 N.C. 213, 218, 287 S.E.2d 832, 835-36 (1982)).

In the instant case the trial court drew from the indictment the name of defendant, the name of the victim, the date of the crime, and the elements of the charge for which defendant was being tried. " '[T]he statement of the trial court was consistent with the spirit of each statute in question,' and the trial court did not give the jurors 'a distorted view of the case before them by an initial exposure to the case through the stilted language of indictments and other pleadings.' " *Id.* at 689, 392 S.E.2d at 78 (quoting *State v. Leggett*, 305 N.C. at 218, 287 S.E.2d at 836). As in *State v. Faucette*, the trial court did not read the indictment in its entirety and in particular did not recite the language indicating that twelve or more grand jurors had concurred in issuing the indictment. *See id.* at 688, 392 S.E.2d at 78. We find no error in the trial court's comments to the prospective jurors.

[6] In his next assignment of error, defendant contends that the trial court erroneously issued a blanket ruling that prevented him from questioning prospective jurors about whether the victim's HIV-positive status would affect their ability to be fair and impartial. The fact that the victim was HIV-positive was featured in the pretrial publicity surrounding the case and was also introduced at trial. Defendant contends the issues concerning AIDS and the AIDS virus are extremely controversial and arouse the passions and prejudice of many members of our society. He, therefore, argues that the views of

prospective jurors about these issues were relevant to determining their fitness and competency to serve as jurors on his case.

Defendant contends the trial court's blanket ruling prevented him from discovering whether the victim's HIV-positive status would make any jurors unfairly prejudiced against him or unfairly sympathetic toward the victim. Defendant contends that this ruling violated his right pursuant to N.C.G.S. § 15A-1214(c) to question prospective jurors to determine their fitness and competency to serve on his jury in order to make effective use of his challenges for cause and his peremptory challenges. He further argues that this ruling violated his constitutional right to due process of law. We find defendant's arguments unpersuasive.

Initially, we note that the trial court did not enter a blanket ruling prohibiting defendant from asking any questions about the victim's HIV-positive status during jury *voir dire*. A review of the trial transcript reveals that defendant wanted to question prospective jurors both about the victim's homosexuality and his HIV-positive status. The issue arose during discussion of the State's motion to have the evidence of the victim's homosexuality and HIV-positive status excluded at trial. After the trial court refused to make a ruling on this pretrial motion, the State requested that this information not be mentioned during jury *voir dire*. The trial court ruled that questions about the issue of homosexuality were relevant to identify prospective jurors who might think "gay bashing" was permissible. The trial court stated that questions about HIV should be left out of jury selection but refused to make a blanket ruling prohibiting such questions if the fact that the victim was HIV-positive arose during a prospective juror's response to other questions. The trial judge deferred ruling on this line of questioning until he had a concrete question or answer before him during the jury *voir dire*. At that time counsel for the defense stated that they would not directly ask prospective jurors about AIDS and HIV.

During the jury *voir dire*, none of the prospective jurors mentioned any knowledge of the victim's HIV-positive status, and this line of questioning was not pursued. Little evidence in connection with the victim's HIV-positive status was introduced at trial, and neither the State nor defendant mentioned it during opening or closing arguments.

Pursuant to N.C.G.S. § 15A-1214(c), counsel may question prospective jurors concerning their fitness or competency to serve as

STATE v. KNIGHT

[340 N.C. 531 (1995)]

jurors to determine whether there is a basis to challenge for cause or whether to exercise a peremptory challenge. N.C.G.S. § 15A-1214(c) (1988). "The primary goal of the jury selection process is to ensure selection of a jury comprised only of persons who will render a fair and impartial verdict." *State v. Locklear*, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992). The trial judge has broad discretion to regulate jury *voir dire*. *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994).

"In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby." *Id.* The right to an adequate *voir dire* to identify unqualified jurors does not give rise to a constitutional violation unless the trial court's exercise of discretion in preventing a defendant from pursuing a relevant line of questioning renders the trial fundamentally unfair. *Morgan v. Illinois*, 504 U.S. 719, 730 n.5, 119 L. Ed. 2d 492, 503 n.5 (1992); *Mu'Min v. Virginia*, 500 U.S. 415, 425-26, 114 L. Ed. 2d 493, 506, *reh'g denied*, 501 U.S. 1269, 115 L. Ed. 2d 1097 (1991).

Assuming *arguendo* that this evidence was relevant to a prospective juror's qualifications to be fair and impartial in this case, defendant has shown no abuse of discretion or prejudice arising to the level of fundamental unfairness from the trial court's refusal to allow him to pursue this line of questioning. The evidence of defendant's guilt was overwhelming, and his attorney conceded his guilt during closing arguments. The possibility of juror prejudice against defendant from the victim's HIV-positive status does not rise to the level of fundamental unfairness in the instant case.

We conclude that the trial court's ruling that defendant could not directly pursue this line of questioning unless the victim's HIV-positive status was revealed in the answer of a prospective juror did not violate defendant's rights under N.C.G.S. § 15A-1214(c) or his constitutional right to due process of law. This assignment of error is overruled.

[7] Next, defendant contends that the trial court erroneously admitted the victim's bloody clothes into evidence and allowed the prosecutor to brandish them before the jury during closing argument. Defendant argues that this evidence was irrelevant and inadmissible under Rules 401, 402, and 403 of the North Carolina Rules of Evidence because there was no dispute that the victim died from multiple stab

wounds, that the murder was bloody and gruesome, or that defendant participated in the stabbing of the victim. Defendant further claims that the prosecutor's closing argument, during which he allegedly brandished the victim's bloody clothing in front of the jury, was an improper, inflammatory appeal to emotion and prejudice. Defendant contends that the evidentiary errors and improper argument were prejudicial to him because they made the jury want to convict him of the highest degree crime possible and led to an erroneous finding of premeditation and deliberation. We disagree.

Initially, we note that at trial defendant objected to the admission of this evidence solely on the basis of Rule 403 of the North Carolina Rules of Evidence and has technically waived appellate review on the issue of the relevance of this evidence. N.C. R. App. P. 10(b)(1). However, even if defendant had properly preserved this issue for appeal, the clothing of the victim introduced at trial was clearly relevant and admissible under Rules 401 and 402 of the North Carolina Rules of Evidence.

Bloody clothing of a victim that is corroborative of the State's case, is illustrative of the testimony of a witness, or throws any light on the circumstances of the crime is relevant and admissible evidence at trial. *See State v. Holder*, 331 N.C. 462, 485-86, 418 S.E.2d 197, 210 (1992) (murder victim's bloody shirt properly admitted to illustrate testimony of forensic pathologist); *State v. Miley*, 291 N.C. 431, 435-36, 230 S.E.2d 537, 540 (1976) (victim's bloody shirt admissible because it corroborated State's theory of the case and helped the jury better understand the testimony of a witness); *State v. Sparks*, 285 N.C. 631, 636-37, 207 S.E.2d 712, 715 (1974) (victim's bloody shirt admissible because its appearance helped throw light on the circumstances of the crime), *death sentence vacated*, 428 U.S. 905, 49 L. Ed. 2d 1212 (1976).

In the instant case the bloody jacket, shirt, and T-shirt that the victim was wearing at the time of his murder were admitted into evidence at trial to illustrate the testimony of Dr. Lantz, who used the clothing to illustrate his testimony that the wounds he observed on the victim's body during the autopsy corresponded with the holes in the clothes the victim was wearing at the time of his death. Dr. Lantz testified that although the distortion caused by the large gaping wound to the victim's chest and the fact that some clothing had been pulled to the side or raised during the stabbing made it impossible to line up all the slits in the clothing with the wounds, the holes in the

clothes corresponded with the victim's wounds. The clothes that the victim was wearing at the time of his murder were clearly relevant and admissible at trial.

Pursuant to Rule 403 of the North Carolina Rules of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" to a defendant. N.C.G.S. § 8C-1, Rule 403 (1988). "In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). We conclude that the trial court did not abuse its discretion by admitting this clothing into evidence at trial. As in *State v. Holder*, 331 N.C. at 485-86, 418 S.E.2d at 210, in which this Court concluded that the admission of the victim's bloody shirt did not violate Rule 403, in the instant case the victim's bloody clothing was not excessively displayed or discussed at trial and was used to illustrate the testimony of the doctor who performed the autopsy on the victim's body. Other than Officer Mitchell's chain-of-custody testimony, this evidence was not mentioned after Dr. Lantz's testimony until the prosecutor made reference to it in his closing argument.

During his closing argument the prosecutor unwrapped the packaging around the victim's bloody clothes and showed them to the jury in conjunction with the following argument:

The body of Carlos Stoner is the best evidence of what happened to him. This is real evidence, right here, ladies and gentlemen. This isn't eyewitness testimony[,] corroboration, substantive, illustrative, expert, whatever. This is real evidence, these are Mr. Stoner's real clothes. This is his real blood. This is where his life bled out. [These are] the relics. This is all that's left of Mr. Stoner.

And I want you to look at that. Because I can't ask Mr. Stoner to come in here and tell you how much he suffered. I can't ask Mr. Stoner to come in here and say what happened to him. What did it feel like to lay [sic] there feeling blow after blow, stab after stab go into my body, to feel my eyebrows stabbed, my ears, my neck, my face, my chest, my arms, my legs.

Mr. Stoner can't come in here and tell you how terrifying it is to lay [sic] on your back with wounds to your heart and lungs so

**STATE v. KNIGHT**

[340 N.C. 531 (1995)]

bad that you're incapacitated enough that you just have to lay [sic] there because you can't breathe enough to even roll over.

Mr. Stoner can't come in here and tell you about laying [sic] in this isolated spot on the Greenway wondering is somebody going to come along and find me before I die so I can get to a hospital, have somebody get to me so I can tell what happened. Mr. Stoner can't do that. This is the closest we'll ever get to it. These clothes right here. Mr. Stoner's t-shirt. There's a logo on it, says Parents Magazine. Parents Magazine. Parents Magazine.

Mr. Knight cut Mr. Stoner's rib cage open right through a logo that says Parents Magazine.

Although he did not object to this argument or the display of the victim's clothing at trial, defendant now argues that this argument and display constituted an inflammatory appeal to emotion and prejudice and that it was shocking, gruesome, and unfairly theatrical.

Counsel is allowed wide latitude in the argument of hotly contested cases and may argue all the facts in evidence and any reasonable inferences that can be drawn therefrom. *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), *sentence vacated on other grounds*, 336 N.C. 508, 444 S.E.2d 443 (1994). In the absence of any objection at trial to a jury argument, the standard of review to determine if the trial court erred by not intervening *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper that it interfered with defendant's right to a fair trial. *State v. Sexton*, 336 N.C. 321, 362, 444 S.E.2d 879, 902, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994). In the instant case the prosecutor's argument was not so grossly improper as to require the trial court to intervene *ex mero motu*.

The prosecutor did not exceed the scope of the evidence or reasonable inferences therefrom by referring to the victim's bloody clothes or the stab wounds and injuries the victim suffered while wearing those clothes. As indicated above, the bloody clothing was relevant to shed light on the circumstances of the crime and to illustrate the testimony of Dr. Lantz. Further, the transcript is devoid of support for defendant's contention that the prosecutor theatrically unwrapped and brandished these clothes before the jury. The transcript merely reflects that the prosecutor briefly displayed the cloth-

ing incident to this legitimate argument and then closed up those exhibits and continued with his closing argument.

We conclude that the trial court did not err by admitting this evidence into trial or by failing to intervene *ex mero motu* to prevent the prosecution from displaying this clothing during the State's argument that this was the best evidence of what had happened to the victim.

[8]  In his final assignment of error, defendant contends that he is entitled to a new trial because the prosecutor improperly engaged in prosecutorial misconduct by knowingly asking impertinent and insulting questions of two witnesses during trial that could not possibly have elicited relevant evidence. Defendant contends that these questions were posed for the sole purpose of badgering, degrading, and humiliating defendant and his witnesses. He claims the effect of these questions destroyed the fundamental dignity and solemnity of the trial and influenced the jurors to have a flippant attitude towards defendant's guilt and the trial process itself, in violation of his right to a fair trial. We disagree.

The first incident about which defendant complains occurred during the prosecutor's redirect examination of Dr. Lantz, the pathologist who performed the autopsy on the victim. During his direct testimony, Dr. Lantz acknowledged that the victim's body fluids showed a high alcohol content of .28. During cross-examination, defendant inquired about the anesthetic effect of alcohol on the human body and whether a blood alcohol level of .28 would lessen the sensory perception of pain. Dr. Lantz responded that "[i]t would lessen it, but not abolish it." During the State's redirect examination of Dr. Lantz, the following exchange occurred:

Q.   And what level of alcohol concentration would they have to have in their blood in order for this chart to show that they did not feel any pain?

A.   That's near the botom [sic] of the chart. Blood alcohol concentration of point three five to point five zero, stage of influence of alcohol is coma, causing complete unconsciousness. Coma, anesthesia or lack of pain, depressed o[r] abolished reflexes, subnormal temperature, incontinence of urine and feces, embarrassment of circulation and respiration, and possible death.

Q.   All right. So [a] person would have to be in a coma or near death before they would no longer be able to feel pain under the influence of alcohol alone, is that correct?

A. Alcohol is not that good of.an anesthetic. A person basically would have to be comatose before they would no longer experience pain.

Q. All right. Dr. Lantz, would you recommend heart surgery in which you opened up someone through the rib cage in which you used alcohol alone as an anesthetic?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. As I said before, alcohol is a very poor anesthetic. To achieve anesthesia or abolish the pain sense, you—alcohol has to be in such a concentration to cause someone to be comatose. And at that point, it's very close to the point of death.

Counsel "may not needlessly badger or humiliate [a witness] by asking insulting and impertinent questions which he knows will not elicit competent or relevant evidence." *State v. Daye*, 281 N.C. 592, 596, 189 S.E.2d 481, 483 (1972). However, in the instant case the prosecutor's question was not posed merely to badger, degrade, or humiliate either defendant or Dr. Lantz but was clearly relevant under Rule 401 of the North Carolina Rules of Evidence to address the factual issue raised by defendant concerning alcohol's ability to blunt pain perception. N.C.G.S. § 8C-1, Rule 401 (1992). The analogy to heart surgery was apt, in light of the witness' earlier testimony that the victim's chest had been split open during the course of the stabbing, exposing his heart and right lung. The prosecutor's question clarified and refuted defendant's suggestion that the victim's alcohol consumption had anesthetized him from the pain of the massive wounds inflicted upon him. Nothing about the form of the question posed by the prosecutor was insulting or impertinent.

The second incident about which'defendant complains under this assignment of error occurred during the prosecutor's cross-examination of Thomas McGee, who testified during direct examination that on the day of the murder, he and defendant consumed a large quantity of alcohol, which had had an effect on defendant's behavior. During cross-examination by the State, the following exchange occurred:

Q. Would you say you had as much beer to drink as Rickey Knight that night?

A. Close, if not just as much.

Q. Well, did all the beer you drink [sic] make you want to go out and cut up somebody like a fish?

[DEFENSE COUNSEL]: Objection. Motion to strike.

THE COURT. Sustained. Disregard that.

A  defendant is entitled to a new trial on the basis of an improper question if there is a reasonable possibility that such an improper question affected the outcome of his trial. N.C.G.S. § 15A-1443(a) (1988); *State v. Whisenant*, 308 N.C. 791, 794-95, 303 S.E.2d 784, 786 (1983). Merely asking an improper question to which an objection is sustained does not automatically result in prejudice to a defendant. *State v. Whisenant*, 308 N.C. at 794-95, 303 S.E.2d at 786; *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979). When the trial court sustains a defendant's objections to improper questions and instructs the jury to disregard such questions, any possible prejudice to the defendant is cured. *State v. Walker*, 319 N.C. 651, 655, 356 S.E.2d 344, 346 (1987).

Although the prosecutor's question was improper, there is no reasonable possibility that such an improper question affected the outcome of defendant's trial, in light of all the evidence against defendant, including his own confession conceding his initial participation in the stabbing and his return to ensure the victim was dead. There is no evidence to support defendant's assertion that this question destroyed the fundamental dignity and solemnity of the trial or his assertion that this question led the jurors to take a flippant attitude towards defendant's guilt and this trial. No incompetent evidence was placed before the jury as a result of this question. The trial court properly sustained defendant's objection and instructed the jury to disregard the question. This cured any possible prejudice to defendant from the prosecutor's improper question. This assignment of error is overruled.

Having reviewed the trial transcripts, the record, the briefs of the parties, and oral arguments, we conclude that defendant received a fair trial free of prejudicial error.

NO ERROR.