STATE OF NORTH CAROLINA v. ALLEN LORENZO GAINES AND
BRYAN CORNELIUS HARRIS

No. 486A94

(Filed 11 April 1997)

## 1. Evidence and Witnesses § 1240 (NCI4th)— inculpatory statements to police—noncustodial

The trial court did not err in a capital prosecution for first-degree murder which resulted in a life sentence by denying defendants' motion to suppress statements and physical evidence allegedly obtained as a result of custodial interrogation where the trial court based its conclusions as to defendant Harris on findings that Harris was repeatedly told that he was not under arrest and that he was free to leave at any time, that he signed a written statement that he was not under arrest and was giving a statement voluntarily, and that he had previous experience with the criminal justice system. The trial court's conclusions as to defendant Gaines were based in part on findings that Gaines was told several times that he was not under arrest, that he was repeatedly told that he was free to leave at any time, that he was told that any statement he made would be voluntary, and that he had previous experience with the criminal justice system. The findings were supported by competent evidence and the conclusions that defendants did not undergo custodial interrogation for *Miranda* purposes were correct.

**Am Jur 2d, Criminal Law §§ 788 et seq.**

**What constitutes "custodial interrogation" within the rules of *Miranda v. Arizona* requiring that the suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

## 2. Searches and Seizures § 8 (NCI4th)— inculpatory statement—defendant's presence at police station—not an unconstitutional seizure

Defendant Harris was not improperly seized in a first-degree murder case (and motions to suppress statements and physical evidence obtained as a result were not erroneously denied) where Harris was repeatedly told that he was not under arrest and that he was free to leave at any time, he signed a written statement that he was not under arrest and was giving a state-

ment voluntarily, and he had had previous experience with the criminal justice system.

**Am Jur 2d, Searches and Seizures § 1.**

**3. Evidence and Witnesses § 1218 (NCI4th)— murder—inculpatory statement—knowing, voluntary, intelligent**

The statements of defendant Gaines were not erroneously admitted in a capital first-degree murder prosecution which resulted in a life sentence where defendant contended that the statements were involuntary, unknowing, and unintelligent. Defendant was never taken into custody, he voluntarily agreed to accompany police officers to the police station, he was never searched, handcuffed, restrained, or threatened by police officers, he was left unattended at various times, he was provided with food, drink, and access to rest room facilities, and he was familiar with the criminal justice system. Looking at the totality of the circumstances, the trial judge correctly concluded that defendant's statements were made voluntarily.

**Am Jur 2d, Evidence §§ 719 et seq.**

**4. Evidence and Witnesses § 191 (NCI4th)— murder—victim's suffering—testimony of surgeon—not prejudicial**

There was no prejudicial error in a capital murder prosecution (which resulted in a life sentence) in the admission of testimony from the surgeon who treated the victim that the pain from his wounds "must have been excessive." The State's evidence showed that the victim was shot in the chest with a shotgun and the surgeon testified without objection that the victim had an extensive wound on the upper abdomen and was bleeding profusely from that wound, that there were major injuries in the lower portion of the right lung, and that there were extensive injuries in the upper abdomen.

**Am Jur 2d, Evidence § 1446.**

**5. Evidence and Witnesses § 1501 (NCI4th)— murder of police officer—bloody uniform and equipment—admissible**

The trial court did not err in a prosecution for the murder of a police officer by admitting the victim's bloody shirt, pants, belt, radio, radio holder, and handcuff case, or commit plain error by admitting the victim's nameplate and his badge, even though

defendant offered to stipulate that the victim was wearing the full clothing and equipment of a police officer. The admitted items were relevant for the purpose of enabling the jury to understand the testimony of the witnesses and in order to show matters which were corroborative of the State's case and, given the facts and the testimony, the court did not abuse its discretion under N.C.G.S. § 8C-1, Rule 403 by admitting them. N.C.G.S. § 8C-1, Rule 401; N.C.G.S. § 8C-1, Rule 402.

**Am Jur 2d, Homicide § 413.**

**6. Evidence and Witnesses § 1688 (NCI4th)— murder of police officer—photograph taken before murder— admissible**

Defendant did not show error, much less plain error, in a prosecution for the murder of a police officer in the admission of a photograph of the officer taken while he was alive where the photograph was used for illustrative purposes during the testimony of the victim's wife.

**Am Jur 2d, Evidence §§ 971, 972.**

**7. Jury § 260 (NCI4th)— first-degree murder—jury selection—peremptory challenges—*Batson* challenge—no racial discrimination**

The trial court did not err during jury selection in a prosecution for the murder of a police officer by allowing the prosecutor's peremptory challenges to black prospective jurors. The State set forth reasons for the challenges of six of the seven venire members at issue so that the sole issue as to those six is the court's finding on intentional discrimination. The State articulated its reasons for the challenges and, with one exception, defendants proffered no evidence to show that the prosecutor's reasons were a pretext. Since the trial court's findings as to race neutrality and purposeful discrimination depend in large measure on the judge's evaluation of credibility, those findings should be given great deference. As to the seventh excused venireperson, the trial court found that there were sufficient race-neutral reasons for excusing him, assuming that a *prima facie* case of racial discrimination existed, and the court's findings are given great deference.

**Am Jur 2d, Jury §§ 25 et seq.**

**8. Jury § 257.1 (NCI4th)\*— murder—jury selection—gender discrimination—prima facie case**

The trial court did not err during jury selection for a murder trial by denying defendants' motions to prohibit the State from peremptorily challenging prospective jurors on the basis of gender and to allow defendants to make an evidentiary record to show the prosecutor's gender-based peremptory challenges. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, holding that the State may not intentionally discriminate on the basis of gender in exercising peremptory challenges, is applicable to this case, which was pending on direct review when *J.E.B.* was decided. *Batson* type considerations are relevant, and a review of the record does not disclose a *prima facie* case of purposeful discrimination in that fewer male jurors were called into the jury box for *voir dire* than females; the State attempted to excuse more men than women and, in fact, excused an equal number; the State did not use all of its peremptory challenges; the pattern of jury selection disclosed a relatively even pattern of early strikes; defendants have not advanced any logical reason to conclude that the State had a motive to eliminate women from their jury; and, of twelve jurors and three alternates selected, eight were male and seven female.

**Am Jur 2d, Jury § 156.**

**9. Evidence and Witnesses § 929 (NCI4th)— murder of police officer—statements of officer—excited utterances**

The trial court did not err in a prosecution for the murder of a police officer by allowing three witnesses to testify that the victim said, immediately after the shooting, that he believed he was going to die, that he was having trouble breathing, and that he wanted them to tell his wife that he loved her. These statements were excited utterances and thus are not excluded by the hearsay rule. The statements are relevant in that they were admitted within the context of the testimony of responding officers and paramedics and each served to describe the circumstances and events surrounding and immediately following the shooting. They are not so inflammatory as to be unfairly prejudicial. N.C.G.S. § 8C-1, Rule 803(2); N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence § 659; Homicide § 330.**

**10. Evidence and Witnesses § 1092 (NCI4th)— murder—prearrest silence—use to impeach defendant—no plain error**

There was no plain error in a prosecution for the murder of a police officer where defendant Gaines contended that his rights were violated by the use of his prearrest silence for impeachment purposes during his cross-examination, but did not object at trial. The record reveals that defendant never invoked or relied upon his right to remain silent and the use of his prearrest silence did not violate his Fifth Amendment rights. The fact that the Fifth Amendment is not violated by the use of prearrest silence to impeach defendant's credibility does not mean that admission was proper under common law rules, but, assuming error, defendant has not shown that the error was so fundamental as to constitute a miscarriage of justice.

**Am Jur 2d, Evidence §§ 802 et seq.; Homicide § 339.**

**11. Criminal Law § 432 (NCI4th Rev.)— first-degree murder—prosecutor's argument—defendant's silence—not grossly improper**

The trial court did not err by failing to intervene *ex mero motu* in a first-degree murder prosecution where defendant contended that the prosecutor used his silence to argue that his accident defense was an "after-the-fact fabrication." Defendant did not object at trial and, in view of the wide latitude accorded counsel in closing argument and the substantial evidence against defendant, it cannot be said that the argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial.

**Am Jur 2d, Trial §§ 557-559.**

**12. Criminal Law § 473 (NCI4th Rev.)— first-degree murder—closing arguments—prosecutor's comments regarding defense attorney—not grossly improper**

The trial court did not err by failing to intervene *ex mero motu* in a first-degree murder prosecution where defendant contended that the prosecutor improperly attacked defense counsel's integrity and credibility during closing arguments by arguing that a vigorous cross-examination had been intended to confuse the jury, that defense counsel was "making stuff up" and could not be believed, and that the physical evidence did not lie even though defense attorneys were trying to show that it did. The

prosecutor is entitled to argue any reasonable inference to be drawn from the evidence and to rebut defense counsel's argument. Defendant did not object at trial and, reviewed in context, the arguments were not grossly improper.

**Am Jur 2d, Trial §§ 683 et seq.**

13. **Homicide § 408 (NCI4th); Criminal Law § 745 (NCI4th Rev.)— first-degree murder—instructions—use of "victim"**

The trial court did not err in a first-degree murder prosecution by using the word "victim" throughout its jury instructions; this argument was rejected in *State v. Hill,* 331 N.C. 387.

**Am Jur 2d, Homicide §§ 490, 491.**

14. **Homicide § 374 (NCI4th)— first-degree murder—acting in concert—sufficiency of evidence**

The trial court did not err by denying defendant Harris's motion to dismiss a charge of first-degree murder on the grounds of insufficient evidence where defendant contended that the evidence was insufficient to show that he was acting in concert in that he was not present at the scene, did not commit any of the acts, and did not share a common plan. The evidence was conflicting as to Harris's actual presence, but the State presented as evidence the victim's dying identification of his killers and testimony from a witness who saw three black men run from the scene, and defendant presented evidence that he either remained at the car or walked some distance with the shooter but not all the way to the scene. This is sufficient to support a finding that defendant was either actually or constructively present. The evidence was also sufficient to show that defendant shared the plan to shoot the victim in that defendant encouraged and aided the shooter; provided him with a shotgun; accompanied him to the area and either remained at the car or accompanied him as far as the parking lot at the scene; left with the shooter and another man after the killing; and took possession of the murder weapon and hid it.

**Am Jur 2d, Homicide § 445.**

15. **Criminal Law § 45 (NCI4th Rev.)— first-degree murder— aiding and abetting—presence not required**

There was sufficient evidence to convict defendant Harris of first-degree murder on the theory of aiding and abetting where

STATE v. GAINES

[345 N.C. 647 (1997)]

Harris contended that there was insufficient evidence of his presence at the scene. The evidence amply supported the jury's finding that defendant was either actually or constructively present at the scene; moreover, actual or constructive presence is no longer required to prove a crime under an aiding and abetting theory. Cases decided after N.C.G.S. § 14-5.2 became applicable which suggest that actual or constructive presence is necessary to prove a crime under an aiding or abetting theory are no longer authoritative on this issue.

**Am Jur 2d, Trial § 1256.**

**16. Homicide § 368 (NCI4th)— first-degree murder—mere presence rule—evidence sufficient to convict**

The trial court did not err in a first-degree murder prosecution by denying defendant Harris's motion to dismiss where Harris contended that the evidence was insufficient to support his conviction under the "friend" exception to the mere presence rule. The evidence demonstrates that Harris encouraged and intended to assist Gaines, that Gaines knew of Harris's support and encouragement, and that Harris was not merely present.

**Am Jur 2d, Homicide § 445.**

**17. Homicide § 366 (NCI4th)— first-degree murder—accomplice—evidence of intent to kill—sufficient**

The evidence of defendant Harris's conduct before and after a killing was sufficient to support a finding that Harris acted with premeditation and deliberation where Harris contended that evidence that he provided the weapon and hid it afterward is not substantial evidence of *mens rea* to commit first-degree murder. Proof of premeditation and deliberation is proof of a specific intent to kill and the evidence of defendant's conduct before and after the killing in this case is sufficient to support a finding beyond a reasonable doubt that Harris acted with premeditation and deliberation.

**Am Jur 2d, Homicide § 52.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

**Modern status of the rules requiring malice "afore-thought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

STATE v. GAINES

[345 N.C. 647 (1997)]

**18. Criminal Law § 807 (NCI4th Rev.)— first-degree murder— instructions on aiding and abetting—presence at scene**

There was no plain error in a first-degree murder prosecution where defendant Harris contended that the trial court had erroneously instructed the jury that defendant did not have to be present at the scene in order to be convicted under the theory of aiding and abetting. Under *State v. Bond*, 345 N.C. 1, the trial court was not required to instruct on defendant Harris's presence or lack thereof; moreover, the evidence indicates that defendant was nearby if not actually present when Gaines killed the victim, and the jury therefore probably would not have reached a different verdict but for the instruction.

**Am Jur 2d, Homicide §§ 482 et seq.**

**Supreme Court's views as to prejudicial effect in criminal case of erroneous instructions to jury involving burden of proof or presumptions. 92 L. Ed. 2d 862.**

**19. Homicide § 368 (NCI4th)— first-degree murder—instructions—aiding and abetting—friend exception**

The trial court did not err in a first-degree murder prosecution by instructing the jury on the "friend" exception as part of the instruction on aiding and abetting.

**Am Jur 2d, Homicide § 445.**

**20. Criminal Law § 469 (NCI4th Rev.)— first-degree murder— prosecutor's closing arguments—not grossly improper**

The trial court did not err in a first-degree murder prosecution by not intervening *ex mero motu* to prohibit certain prosecutorial arguments which defendant contends were beyond the evidence or misstated the law. Counsel is given wide latitude in the argument of hotly contested cases and may argue all the facts in evidence and any reasonable inferences that can be drawn therefrom. A review of these arguments in context reveals that they were not so grossly improper as to require the trial court to intervene *ex mero motu*.

**Am Jur 2d, Trial § 502.**

**21. Criminal Law § 498 (NCI4th Rev.)— first-degree murder— jury view—denied**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendants' motion for a jury

view on the grounds that the photographs and measurements submitted by the parties were sufficient to enable the jury to reconstruct the scene and circumstances of the crime.

**Am Jur 2d, Trial § 934.**

**Taking and use of trial notes by jury. 14 ALR3d 831.**

**22. Criminal Law § 758 (NCI4th Rev.)— first-degree murder— instructions—defendant's statement—characterized as confession—not inaccurate**

The trial court did not err in a first-degree murder prosecution by instructing the jury that defendant Harris had confessed to some of the acts alleged where Harris contended that his statement was inculpatory but did not amount to a confession. Harris's statement amounts to a confession to acts which constitute his guilt of aiding and abetting or of acting in concert.

**Am Jur 2d, Homicide §§ 482 et seq.**

**23. Criminal Law § 758 (NCI4th Rev.)— first-degree murder— instructions—defendant's statement—characterized as confession—not an expression of opinion**

An instruction in a first-degree murder prosecution that defendant had confessed to some of the acts charged did not amount to an improper expression of opinion. This issue was decided in *State v. Cannon*, 341 N.C. 79.

**Am Jur 2d, Homicide §§ 482 et seq.**

**24. Criminal Law § 939 (NCI4th Rev.)— first-degree murder— verdict not inconsistent**

There was no error in a first-degree murder prosecution where defendant contended that the jury was inconsistent in that it found him guilty of first-degree murder but found on the Issues and Recommendation as to Punishment form that defendant did not have the specific intent to kill the victim. The verdict in the guilt-innocence phase that defendant was guilty of premeditated and deliberate murder either under the theory of acting in concert or by aiding and abetting is not inconsistent with the jury's later indication that defendant did not himself intend to kill the victim. The verdicts are not reviewed on the grounds of inconsistency since the jury determined that the evidence of *mens rea* was sufficient for the jury to find defendant

guilty beyond a reasonable doubt on either or both theories of accomplice liability.

**Am Jur 2d, Coram Nobis & Allied Statutory Remedies § 54.**

* New section pending publication of next NCI4th supplement.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of life imprisonment entered by Downs, J., at the 23 August 1993 Mixed Session of Superior Court, Mecklenburg County, upon jury verdicts finding defendants guilty of first-degree murder. Heard in the Supreme Court 13 February 1996.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, and Jill Ledford Cheek, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant Gaines.*

*Isabel Scott Day, Public Defender, by Julie Ramseur Lewis, for defendant-appellant Harris.*

PARKER, Justice.

Defendants were tried jointly and capitally for the first-degree murder of Charlotte Police Officer Eugene Anthony Griffin. The jury found both defendants guilty of first-degree murder and recommended a life sentence for each defendant.

The State's evidence at trial tended to show that in November 1991 the victim, Eugene Anthony Griffin, had a full-time job as a Charlotte police officer and also worked as a security guard for a Red Roof Inn motel in Charlotte, North Carolina. On 21 November 1991 defendants Allen Lorenzo Gaines and Bryan Cornelius Harris, along with Mustafa Coleman, went to the Red Roof Inn to see Anthony Williams. The victim intercepted the three men on the motel stairwell, identified himself as a police officer, and told them that there was not going to be a party and that only one of them could go up to see Williams. When Gaines became argumentative, the victim grabbed Gaines by the jacket collar and told him to leave the property. The three men got into their car, yelled obscenities, and drove away. As the men left the motel, Gaines told Harris and Coleman that he was

**STATE v. GAINES**

[345 N.C. 647 (1997)]

going to "get" the victim. Harris said, "do you want the twelve gauge"; and Gaines replied, "yes."

The three men went to the apartment of Sandra Carrington, where Harris retrieved a shotgun. The men then drove back to the motel. Gaines parked the car in the State Farm Insurance parking lot which was located behind the motel, walked through the woods to the back of the motel, put a woman's stocking on over his face, then went into the motel office with the shotgun and shot the victim in the chest. Gaines returned to the car, and the three men drove away. Harris later hid the shotgun under his house.

Immediately after the shooting the victim called for help on his police radio. Kevin Penegar, the night auditor and front desk clerk at the Red Roof Inn, called 911. Officers Beverly Stroup and Fred Allen responded to the victim's emergency call. The victim told Stroup that he had been shot by "the same guys [he] had trouble with earlier." The victim described the suspects, described the vehicle driven by the men, and recited a license-tag number. The victim also said, "Tell [my wife] that I love her." The victim died later that night of a gunshot wound to the chest and abdomen.

Sandy Bolton, a guest at the motel, testified that she heard a gunshot, looked out her window, and saw three men running through the parking lot.

Defendant Gaines testified on his own behalf. He said that after the original altercation with the victim, he left the motel crying because the officer had hurt his feelings. Gaines testified that the three men returned to the motel in order to scare the victim. He stated that he was planning to shoot into the air in the motel parking lot and never intended to shoot the victim. He put a woman's stocking over his face so that the victim would not recognize him. Gaines testified that he walked through the woods to the motel while Harris and Coleman remained near the car. He said that when he stepped in front of the motel lobby door, he saw the victim drawing his gun. Gaines stated that he was trying to get away when the gun went off; he did not remember pulling the trigger.

Defendant Harris presented no evidence.

ISSUES RAISED BY DEFENDANTS GAINES AND HARRIS

Defendants first argue that it was error to deny their motions to suppress evidence of statements and physical evidence. A suppres-

sion hearing was held before Judge Forrest A. Ferrell on defendants' motions on 21 June 1993. The State's evidence at the hearing tended to show the following: Sergeant Richard Sanders was in charge of the investigators working on the murder of the victim. Sanders instructed Investigator Buening, who was the lead investigator in the interviewing process, that any suspect interviews were to be conducted as noncustodial interviews. Suspects were not to be placed under arrest and would be free to leave, and any contact with suspects would be on a voluntary basis.

Specifically as to defendant Gaines, the evidence showed that Officer William Todd Walther located an automobile believed to be involved in the murder parked in front of Gaines' residence. Investigators R.G. Buening and S.P. Maxfield, both dressed in plain clothes, drove to Gaines' residence in an unmarked vehicle. Several other officers were also present. At approximately 2:30 a.m. Buening knocked on the front door of Gaines' residence. Gaines' mother answered the door. Buening identified himself and asked if the officers could come in. Buening, Maxfield, and one uniformed officer went inside. Buening introduced himself to Gaines and told him that a police officer had been shot and wounded at the Red Roof Inn and that the police had information that he and two friends had been involved in a dispute with the officer earlier in the evening. Buening asked Gaines if he would go to the Law Enforcement Center to talk with them about the earlier dispute with the officer. Buening told Gaines he was not under arrest, and Gaines agreed to go. Gaines' mother had no objection to her son accompanying the officers to the Law Enforcement Center.

Buening asked Gaines to sit in the front passenger seat of an unmarked police vehicle. Buening then obtained written consent from Gaines to search his automobile. Buening conducted a "plain-view" search of the vehicle while Gaines sat unattended in the unmarked, unlocked police vehicle. Buening then asked Gaines if he would show him where Harris and Coleman lived; Gaines agreed. At this point Buening went back to the residence to speak with Gaines' mother, again leaving Gaines unattended in the vehicle. Buening asked Gaines' mother if she wanted to accompany her son to the Law Enforcement Center; she declined. On the way to the Law Enforcement Center, Buening again told Gaines he was not under arrest.

At the Law Enforcement Center, Gaines was asked to sit in a large interview room. Gaines was not handcuffed. Sanders testified that

"emotions were high" among police officers at the Law Enforcement Center and that he was concerned about the suspects' safety and about the "interrogative case." Sanders instructed officers not to let anybody other than investigators directly involved in the case interfere in any way. At approximately 4:00 a.m. Sanders assigned Officer D.R. Faulkenberry to sit with Gaines. Faulkenberry sat with Gaines from 4:00 a.m. to 7:00 a.m. Sanders entered the room on two occasions and asked the men if either of them needed anything. During this time Investigator C.E. Boothe introduced himself to Gaines and advised Gaines that he was working on the case.

When Officer Faulkenberry went off duty, Investigator R.D. Roseman sat with Gaines. Roseman introduced himself and told Gaines that he was not under arrest, that he was free to leave at any time, and that any statements he made would be made voluntarily at defendant's request. Gaines told Roseman that "he didn't know why he was there" and that "he wanted to know when he could leave." Roseman testified that he did not answer Gaines' question about when Gaines could leave but left the interview room, conferred with Sanders in the hallway, and told Sanders he felt Gaines was ready to make a statement.

At approximately 7:30 a.m. Sanders asked Investigator D.L. Rock to sit with Gaines. Rock asked defendant if he needed anything to eat, and Gaines said that he was hungry. Shortly thereafter a police officer brought two steak biscuits for Gaines. At approximately 9:30 a.m. Gaines asked Rock if the police officer was dead; Rock replied that he was dead. Gaines asked Rock if he could speak with the other police officer, and he described Investigator Boothe. Boothe testified that he entered the room, told defendant he was not under arrest, told defendant he could leave at any time, and told defendant he did not have to make a statement. Boothe also told Gaines that Harris and Coleman had already given statements. Boothe asked Gaines if he had shot the police officer; Gaines admitted that he had and then gave a statement. Gaines signed a written statement which included language that he had given the statement of his own free will, knowing that he was not under arrest. After Gaines completed his statement, Boothe placed Gaines under arrest and read Gaines his rights; Gaines requested a lawyer.

Specifically as to defendant Harris, the evidence showed that at 3:00 a.m. on 22 November 1991, Investigator Buening knocked on Harris' door. Harris' mother answered the door; Buening identified

himself and said he was looking for Harris. Buening asked if he could come in, and Mrs. Harris agreed. Investigator Maxfield also entered the residence. Buening and Maxfield entered the house, and a uniformed police officer stayed at the door. Mrs. Harris opened the door to her son's bedroom; Harris was on the bed, and Buening introduced himself as a police officer. Buening told Harris that a police officer had been shot and wounded at the Red Roof Inn and that the police had information that earlier in the evening, Harris and two friends had had a dispute with the officer. Buening told Harris that he was not under arrest and asked Harris if he would be willing to go with the officers to the police station to talk about the earlier dispute with the officer. Harris agreed to go with the officers. Harris' mother indicated that she did not have any objections to her son going with the officers.

Harris was asked to sit in the backseat of Officer R.W. Shiflett's marked patrol vehicle. Buening again told Harris that he was not under arrest and that Buening appreciated his cooperation. Harris informed Shiflett that he had asthma and needed his medication. Shiflett went to Harris' residence and obtained the medication from Harris' mother. Harris was taken to the police station by Shiflett; there was no conversation between Shiflett and Harris during the ride. There were no door handles on the inside of the vehicle's back door. Harris was not handcuffed. At the Law Enforcement Center, Harris and Shiflett sat in an interview room. There was no conversation between Shiflett and Harris.

Sergeant Sanders assigned Investigators Boothe and L.D. Walker to talk with Harris. At 4:25 a.m. the two investigators went into the interview room. Both men were dressed in casual clothes, and neither carried weapons. The investigators told Harris it was their understanding that Harris had volunteered to come down and talk. Harris replied that that was correct. The investigators then suggested they move from the small interview room to a larger one. Harris was not handcuffed or restrained. The investigators asked Harris if he wanted anything to eat or drink, or if he needed to go to the bathroom; Harris declined. The investigators told Harris that he was not under arrest, that it was their understanding Harris had come to the Law Enforcement Center voluntarily, that he did not have to make a statement, and that he was free to leave at any time. Harris stated that he had come voluntarily and that he would talk with the investigators.

Harris gave an account of the initial confrontation at the motel. He stated that after the confrontation, the men left and did not return. Investigator Walker told Harris that they knew he had gone back and that they just wanted Harris to tell the truth. Harris then stated that he did go back but that he did not shoot the victim. Harris then gave an account of the killing which implicated Gaines as the shooter. Harris signed a statement which included language that he had come to the Law Enforcement Center voluntarily, that he knew he was not under arrest, and that he had given the statement voluntarily. Harris was provided with soft drinks and breakfast during this time and was allowed to go to the rest room. Harris then accompanied several officers in an unmarked police van and pointed out the location where defendants had parked the automobile the second time they went to the Red Roof Inn, the location of the apartment where Gaines had obtained the shotgun, and the location where Harris alleged Gaines had hidden the shotgun. Harris and the officers then returned to the Law Enforcement Center. Investigator Boothe then advised Walker that Gaines contended that Harris had obtained the shotgun and that Harris had hidden it under his own house. Harris then stated that he had obtained the shotgun from Sandra Carrington and that he had not originally given this information in order to protect Carrington. Harris also stated that the shotgun was hidden under his house. Harris then made a second signed written statement regarding the shotgun that began, "I realize that I am still not under arrest and am giving Officers Walker and Boothe another statement to clarify and correct some parts of my earlier statement." After Harris made the second statement, Investigator Rock took Harris back to his home in an unmarked police vehicle. Harris was arrested later that night.

[1] Both defendants assign error to the trial court's denial of pretrial motions to suppress evidence of statements and physical evidence. Defendants contend that the statements and physical evidence were obtained as a result of custodial interrogation and that defendants were not advised of their juvenile rights or given *Miranda* warnings. *See* N.C.G.S. § 7A-595 (1995); *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966).

This Court has consistently held that the rule of *Miranda* applies only where a defendant is subjected to custodial interrogation. *See, e.g., State v. Phipps*, 331 N.C. 427, 442, 418 S.E.2d 178, 185 (1992). Similarly, N.C.G.S. § 7A-595(d) pertains only to statements obtained from a juvenile defendant as the result of custodial interrogation. Custodial interrogation " 'mean[s] questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Phipps*, 331 N.C. at 441, 418 S.E.2d at 185 (quoting *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706). To determine whether a person is in custody, the test is whether a reasonable person in the suspect's position would feel free to leave. *State v. Rose*, 335 N.C. 301, 334, 439 S.E.2d 518, 536, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994).

The United States Supreme Court has held that in determining whether a suspect was in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 128 L. Ed. 2d 293 (1994) *(per curiam)*. The United States Supreme Court has recognized that any interview of a suspect by a police officer will have coercive aspects to it. *Oregon v. Mathiason*, 429 U.S. 492, 50 L. Ed. 2d 714 (1977) *(per curiam)*. However, the United States Supreme Court has also recognized that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* at 495, 50 L. Ed. 2d at 719.

In the instant case a suppression hearing was held on defendants' motions. Judge Ferrell issued an order on 7 July 1993 setting forth extensive findings of fact and conclusions of law based on evidence presented during the hearing.

As to defendant Harris, Judge Ferrell concluded that Harris' statements to police officers were made voluntarily and were not the result of custodial interrogation. Judge Ferrell also concluded that Harris' agreement to show police officers where he had hidden the shotgun was voluntary.

Judge Ferrell based his conclusions, in part, on his findings that Harris was repeatedly told that he was not under arrest, that Harris was repeatedly told that he was free to leave at any time, and that Harris signed a written statement wherein he stated that he was not under arrest and was giving a statement voluntarily. Judge Ferrell also relied on the fact that Harris had previous experience with the criminal justice system.

Our review of the evidence shows that Judge Ferrell's findings of fact were supported by competent evidence. Further, his conclusion

STATE v. GAINES

[345 N.C. 647 (1997)]

that under these facts Harris did not undergo custodial interrogation for *Miranda* purposes at the relevant times was correct. *See State v. Lane*, 334 N.C. 148, 431 S.E.2d 7 (1993) (defendant not in custody when he was told he was free to leave on several occasions during the interview; he did not ask to leave, nor did he request an attorney; and he was not placed under arrest but was taken home by the SBI investigators); *Phipps*, 331 N.C. 427, 418 S.E.2d 178 (defendant not in custody when, upon request, he went to the police station on his own several times and answered questions; he was not placed under arrest but was permitted to return home; and he later agreed to take a polygraph test); *State v. Martin*, 294 N.C. 702, 242 S.E.2d 762 (1978) (defendant not in custody when he voluntarily went to the police station and made a statement while he was not under arrest and his freedom was not restricted, and police officers returned him to his home afterwards).

As to defendant Gaines, Judge Ferrell concluded that Gaines' statements to police officers were given voluntarily and were not the result of custodial interrogation. Judge Ferrell based his conclusions, in part, on his findings that Gaines was told several times that he was not under arrest, that he was repeatedly told that he was free to leave at any time, and that he was told that any statement he made would be voluntary. Judge Ferrell also relied on the fact that defendant had previous experience with the criminal justice system.

Our review of the evidence shows that Judge Ferrell's findings of facts as to Gaines were supported by competent evidence. Further, his conclusion that under these facts Gaines did not undergo custodial interrogation for *Miranda* purposes was correct.

[2] In addition to the above argument, defendant Harris contends Judge Ferrell erred in denying his motions to suppress statements and physical evidence when such were obtained as a result of defendant's unconstitutional seizure. This contention also has no merit. "Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16 (1968). Whether someone has been seized for purposes of the Fourth Amendment depends on whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980); *State v. Johnson*, 317 N.C. 343, 360, 346 S.E.2d 596, 606 (1986).

Defendant argues that, under the circumstances of the instant case, a reasonable person would not have believed he was free to leave. For the reasons stated above, we conclude that defendant Harris was not improperly seized. This assignment of error is overruled.

[3] Defendant Gaines further contends that Judge Ferrell erred in allowing the admission of his pretrial statements when the statements were "involuntary, unknowing, unintelligent, and obtained in violation of the Fifth and Fourteenth Amendments [to] the United States Constitution and Article I, Section 23 of the North Carolina Constitution." In determining whether a defendant's confession is voluntarily made, this Court considers the totality of the circumstances. *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). In *Hardy* this Court set out factors to be considered in this inquiry:

> whether defendant was in custody, whether he was deceived, whether his *Miranda* rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*Id.* at 222, 451 S.E.2d at 608. Defendant's age and the deprivation of food or sleep may also be considered. *Id.*

Judge Ferrell found in his conclusions of law that defendant voluntarily complied with Buening's request to leave his residence and go with the investigator and that defendant's statements were voluntarily given. These conclusions are supported by the findings of fact which were supported by the evidence in the record. Defendant was never taken into custody; defendant voluntarily agreed to accompany police officers to the police station; defendant was never searched, handcuffed, restrained, or threatened by police officers; defendant was left unattended at various times; and defendant was provided with food, drink, and access to rest room facilities. Furthermore, defendant was familiar with the criminal justice system. Looking at the totality of the circumstances in this case, Judge Ferrell correctly concluded that Gaines' statements were made voluntarily. Thus, this assignment of error is overruled.

[4] Defendants next contend the trial court erroneously allowed Dr. Francis Robicsek, the surgeon who treated the victim, to testify that the pain from the victim's wounds "must have been excessive."

Defendants contend Dr. Robicsek's testimony was not relevant and not admissible under N.C.G.S. § 8C-1, Rules 401 and 402. Defendants argue that the details of the victim's injuries and pain "were intentionally elicited by the prosecutor in an attempt to create sympathy for Griffin and to excite prejudice against defendants" and that any alleged probative value of this evidence was substantially outweighed by the danger of unfair prejudice. *See* N.C.G.S. § 8C-1, Rule 403 (1988).

The State's evidence at trial showed that the victim was shot one time in the chest with a shotgun. Dr. Robicsek testified, without objection, that the victim had an extensive wound on the upper abdomen and was bleeding profusely from that wound, that there were major injuries in the lower portion of the right lung, and that there were extensive injuries in the upper abdomen. In light of this testimony, Dr. Robicsek's statement, that the victim's pain was "excessive," cannot be said to be unfairly prejudicial. This assignment of error is overruled.

[5] Defendants next contend that the trial court erroneously admitted the victim's bloody shirt, pants, belt, radio, radio holder, and handcuff case and that these items were improperly displayed to the jury. Defendants further contend the trial court erroneously admitted a photograph of the victim taken while he was alive as well as the victim's nameplate and badge. Defendants argue that this evidence was irrelevant and inadmissible under Rules 401, 402, and 403 of the North Carolina Rules of Evidence in that defendants offered to stipulate that the victim was wearing the full clothing and equipment of a Charlotte police officer. This evidence, according to defendants, did not have any tendency to make the existence of any consequential fact more or less probable and neither proved any element of the State's case nor rebutted any defense.

Initially, we note that defendant Harris did not object to the admission of the photograph of the victim, the police badge, and the nameplate. Thus, to prevail on this issue Harris must show that the error, if any, amounted to plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983); N.C. R. App. P. 10(c)(4). Plain error is error which is " 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d

912 (1988)). In this case the victim's police uniform and its accessories were relevant and admissible under Rules 401 and 402 of the North Carolina Rules of Evidence. "Bloody clothing of a victim that is corroborative of the State's case, is illustrative of the testimony of a witness, or throws any light on the circumstances of the crime is relevant and admissible evidence at trial." *State v. Knight*, 340 N.C. 531, 559, 459 S.E.2d 481, 498 (1995).

In the instant case the victim's wife, Hilda Griffin, testified as to the police uniform and equipment worn by her husband on the night of his murder. Officer Fred Allen testified as to the scene he witnessed at the motel, including the victim's bloody gun and his radio. Jerry Lee Hicks, a crime-scene search technician, testified as to the murder scene as it was left after the victim was taken to the hospital, including his observations of the victim's radio and police gun. Paramedic crew chief Michael Keller testified to his observations, including the fact that the victim's shirt had been ripped open. The admitted items were relevant for the purpose of enabling the jury to understand the testimony of the witnesses and in order to show matters which were corroborative of the State's case.

Pursuant to Rule 403 of the North Carolina Rules of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" to a defendant. N.C.G.S. § 8C-1, Rule 403. The exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is generally left to the discretion of the trial court. *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Given the facts and testimony in the instant case, we conclude that the trial court did not abuse its discretion by admitting the victim's police uniform and its accessories into evidence.

**[6]** The photograph of the victim was also properly admitted. " 'Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Holden*, 321 N.C. 125, 140, 362 S.E.2d 513, 524 (1987) (quoting *State v. Watson*, 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984)), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). When determining the admissibility of a photograph, the trial court should consider "[w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, [and] the scope and clarity of the testimony it accompanies." *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527.

In the present case the photograph was used for illustrative purposes during Hilda Griffin's testimony to describe her husband while alive. The admission of one photograph depicting Officer Griffin while he was alive was not error. *See State v. Bell*, 338 N.C. 363, 450 S.E.2d 710 (1994) (admission of photograph of victim dressed in police uniform taken prior to the murder properly admitted), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 861 (1995). Based on our review of this evidence, we conclude that the trial court did not commit error by admitting this photograph. Defendants having failed to show error, much less plain error, this assignment of error is overruled.

Both defendants request that this Court examine certain sealed police records and that it order a new trial if the records contain relevant and impeaching evidence. Prior to trial defendants moved for the disclosure of information in the Internal Affairs file and personnel file of the victim. After a hearing on 12 April 1993, Superior Court Judge Ferrell ordered the production of these files for his *in camera* inspection. On 7 July 1993 Judge Ferrell issued an order concluding that the files contained no information to which the defendants were entitled. After a careful review of the files, we conclude that they contain no information relevant to any material fact in this case and that the trial court did not err in its ruling.

[7] Defendants next argue that the trial court erred in allowing the prosecutor's peremptory challenges to seven black prospective jurors: George Lineberger, Pamela O'Rear, Mildred Houston, Reginald Alexander, Lisa Marshall, Robert Watkins, and Michael Caldwell. Defendant Gaines filed a pretrial motion requesting that the trial court enter a ruling prohibiting the State from exercising its peremptory challenges so as to excuse any prospective juror solely on account of his race. Defendant Harris later joined in this motion, and the motion was allowed.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution forbid the use of peremptory challenges for a racially discriminatory purpose. *Batson v. Kentucky*, 476 U.S. 79, 86, 90 L. Ed. 2d 69, 80 (1986); *State v. Williams*, 339 N.C. 1, 15, 452 S.E.2d 245, 254 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 61 (1995).

When an objection is made to the exercise of a peremptory challenge on the ground that the challenge is racially motivated, the defendant must first "make a prima facie showing that the prosecutor

**STATE v. GAINES**

[345 N.C. 647 (1997)]

has exercised peremptory challenges on the basis of race." *Hernandez v. New York*, 500 U.S. 352, 358, 114 L. Ed. 2d 395, 405 (1991). If the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. *Id.* at 358-59, 114 L. Ed. 2d at 405. This Court then permits the defendant to introduce evidence that the State's explanations are merely a pretext. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). "Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405.

In the instant case the State set forth reasons for the challenges of six of the seven venire members at issue. Therefore, as to these six venire members, the sole issue before this Court is the trial court's finding of fact on the question of intentional discrimination. *See Williams*, 339 N.C. at 17, 452 S.E.2d at 255.

As to Mr. Lineberger, the prosecutor stated he excused this prospective juror on the ground that Lineberger had sons roughly the same age as the defendants. Furthermore, when the prosecutor asked Lineberger whether this fact would have any effect on his ability to render a fair verdict, Lineberger initially did not answer and then said that he did not think so. When asked the question again, Lineberger said he did not believe it would have an effect.

As to Ms. O'Rear, the prosecutor stated that he excused this prospective juror on the grounds that she had lived in the area where the events at issue occurred; that she had studied the elements of crime as well as the penal system, parole, and probation; and "that she might take in her own ideas about . . . those matters other than what the Court would instruct her." The prosecutor further stated that O'Rear had young children and that she might compare her children with the defendants.

As to Ms. Houston, the prosecutor stated that he excused this prospective juror based on the fact that her son, who had an unstable work record, lived with her; and the prosecutor believed Houston might identify the defendants with her son. The prosecutor also stated that Houston seemed to have trouble understanding some of the questions, that she was very soft-spoken, and that she had filled out only six items on the jury questionnaire. Finally, the prosecutor stated that he believed Houston would have difficulty understanding the complex legal issues in the case.

## STATE v. GAINES

[345 N.C. 647 (1997)]

As to Mr. Alexander, the prosecutor stated that he excused this prospective juror on the grounds that Alexander had been arrested for driving while impaired and had an unstable work history.

As to Ms. Marshall, the prosecutor stated that he excused this prospective juror based on the fact that her cousin had been charged with rape, her cousin's age was close to that of defendants, she stated she had been wrongly charged by the police, and she worked with retarded children and would be sympathetic to defendants. The defense sought to show that the reasons stated were a pretext.

As to Mr. Watkins, the prosecutor stated that he excused this prospective juror based on the fact that Watkins indicated he had had a bad experience with a police officer concerning a mistaken identity.

We find no error in the ruling by the trial court on the peremptory challenge of these jurors. The State articulated its reasons for the challenges, and the court found that the reasons articulated by the State were racially neutral and did not show any purposeful discrimination. With the exception of Ms. Marshall, neither defendant proffered any evidence to show that the reasons offered by the prosecutor were merely a pretext. *See State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 152 (1990) (defense counsel was apparently satisfied by the explanations offered by the State because no effort was made by the defense to demonstrate that the explanations were merely a pretext). Furthermore, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406; *see also Purkett v. Elem*, 514 U.S. 765, —, 131 L. Ed. 2d 834, 839-40 (1995) (*per curiam*). Since the trial court's findings as to race neutrality and purposeful discrimination will depend in large measure on the trial judge's evaluation of credibility, these findings should be given great deference. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21. We conclude that the trial court's findings were supported by the record and hold that the trial court properly overruled defendants' objections to the excusal of these six prospective jurors.

As to Mr. Caldwell, we first note that Gaines was the only defendant to object to his excusal. Upon Gaines' objection the trial court specifically found that there was no *prima facie* showing of racial discrimination. The trial court went on to state that "[p]lenty of cause exists, reasons" for the excusal of this prospective juror. Therefore, the prosecutor did not set forth his reasons for excusing Caldwell.

Assuming *arguendo* that a *prima facie* case of racial discrimination existed, the trial court nonetheless found that there were sufficient race-neutral reasons for excusing this particular venireman. A review of the *voir dire* of Caldwell reveals that he had a history of temporary employment; that he had two sons, ages eighteen and fourteen; and that he had been arrested for driving while impaired. We give the trial court's findings great deference. *Id.* Thus, we hold that the trial court properly overruled defendant's objection to the excusal of prospective juror Caldwell.

**[8]** Defendants next contend the trial court erroneously denied their motions to prohibit the State from peremptorily challenging prospective jurors on the basis of gender and to allow defendants to make an evidentiary record to show the prosecutor's gender-based peremptory challenges. Defendant Gaines filed a pretrial motion to prohibit the State from peremptorily challenging prospective jurors on the basis of gender. At a pretrial hearing defendant Gaines renewed this motion and moved the trial court, upon objection, to hold a hearing outside the presence of the jury on the gender-discrimination issue so that the appropriate information could be included in the record; the State could offer its neutral justifications, if any; and then the trial court could determine whether an equal protection violation had occurred. Codefendant Harris joined in these motions. The trial court denied the motions.

In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89 (1994), the United States Supreme Court held that the State may not, under the Equal Protection Clause, intentionally discriminate on the basis of gender in the exercise of its peremptory challenges. The decision in *J.E.B.* was rendered in 1994, after this case was tried. However, in *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649 (1987), the Supreme Court held that *Batson* applies to litigation pending on direct state review when *Batson* was decided. Thus, we conclude that the holding in *J.E.B.* is applicable to this case pending on direct review when *J.E.B.* was decided.

Defendants assert that their constitutional rights were violated by the denial of this motion and that this denial prevented them from making an evidentiary record about challenges of women and from showing that the prosecutor's challenges of women were gender-discriminatory. We find this contention to be without merit.

"As with race-based *Batson* claims, a party alleging gender discrimination must make a *prima facie* showing of intentional dis-

**STATE v. GAINES**

[345 N.C. 647 (1997)]

crimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B.*, 511 U.S. at 144-45, 128 L. Ed. at 106-07. This Court has identified several factors which may be relevant in determining whether a defendant has established a *prima facie* showing of purposeful discrimination under *Batson*. Those factors include defendant's race; the victim's race; the race of key witnesses; questions and statements made by the prosecutor during jury selection which tend to support or refute an inference of discrimination; repeated use of peremptory challenges against venire members of one race such that it tends to establish a pattern or the prosecution's use of a disproportionate number of peremptory challenges to prospective jurors of that race, *State v. Ross*, 338 N.C. 280, 285, 449 S.E.2d 556, 561 (1994); and whether the State used all of its peremptory challenges, *State v. Jackson*, 322 N.C. 251, 255, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). Another factor is the ultimate racial makeup of the jury. *State v. Smith*, 328 N.C. 99, 124, 400 S.E.2d 712, 724 (1991). We conclude that these same type considerations are also relevant in determining whether a defendant has established a *prima facie* showing of purposeful gender discrimination.

Defendants do not identify any specific instance of gender-based discrimination, and our review of this record does not disclose a *prima facie* case of purposeful discrimination. Fewer male jurors were called into the jury box for *voir dire* than females; the State attempted to excuse more men than women and, in fact, excused an equal number of men and women; the State did not use all of its peremptory challenges; the pattern of jury selection disclosed a relatively even pattern of early strikes; defendants have not advanced any logical reason to conclude that the State had a motive to eliminate women from their jury; and of the twelve jurors and three alternates selected to serve on this case, eight were male and seven were female.

In the absence of a *prima facie* showing of purposeful discrimination, defendants cannot show prejudice or error in the trial court's action. This assignment of error is overruled.

**[9]** Defendants next contend the trial court erroneously allowed three witnesses to testify as to statements allegedly made by the victim immediately after the shooting. Specifically, these witnesses testified that the victim said that he believed he was going to die, that he was having trouble breathing, and that he wanted them to tell his wife that he loved her.

**STATE v. GAINES**

[345 N.C. 647 (1997)]

The State's evidence at trial showed that after the victim was shot, Officer Fred Allen arrived at the motel. Officer Allen was joined by Officer Beverly Stroup. Both Stroup and Allen testified that the victim made several statements including the statement, "Tell Hilda that I love her." Paramedic crew chief Michael Keller testified that the victim stated several times that he could not breathe. Keller also testified that the victim repeatedly asked, "Am I going to die?" and stated several times, "I'm going to die." Defendants concede that these statements are arguably admissible under the excited utterance or dying declaration exceptions to the hearsay rule; however, defendants contend the statements are irrelevant, inflammatory, and unfairly prejudicial.

We first conclude that these statements were excited utterances and thus are not excluded by the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 803(2) (1992). We also conclude that these statements are relevant. In criminal cases every circumstance that is calculated to throw any light on the supposed crime is admissible. *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994). The victim's statements at issue were admitted within the context of the testimony of responding officers and paramedics. Each of the statements served to describe the circumstances and events surrounding and immediately following the shooting. Further, the statements are not so inflammatory as to be unfairly prejudicial pursuant to N.C.G.S. § 8C-1, Rule 403. This assignment of error is overruled.

## ISSUES RAISED BY DEFENDANT GAINES

[10] Defendant Gaines contends that his rights were violated by the use of his prearrest silence for impeachment purposes. On direct examination at trial, Gaines testified that he did not mean to shoot the victim; that he was trying to get away after he stepped in front of the lobby door and saw the victim drawing his gun; that he fell, tripped, or stumbled at about the same time the gun went off; and that the shooting was an accident. In Gaines' pretrial statement to Boothe, he told Boothe that as he went into the motel lobby, he stumbled, and the gun went off one time. On cross-examination the prosecutor asked Gaines a series of questions as to why Gaines did not tell various officers other than Boothe on 22 November 1991 that the shooting was an accident. Gaines contends that his rights were violated by the use of his prearrest silence for impeachment purposes during this cross-examination.

A criminal defendant's exercise of his right to remain silent cannot be used against him to impeach an explanation subsequently offered at trial. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976). However, the rule prohibiting the cross-examination of a defendant about the exercise of his right to remain silent does not apply to prearrest silence. *Jenkins v. Anderson*, 447 U.S. 231, 65 L. Ed. 2d 86 (1980). In the instant case the use of defendant's prearrest silence does not violate his Fifth Amendment rights. The record reveals that defendant never invoked or relied upon his right to remain silent.

The fact that the Fifth Amendment is not violated by the use of prearrest silence to impeach a defendant's credibility, however, does not mean that admission of this testimony was proper under our common law rules. In *Jenkins* the Court noted that

[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

*Id.* at 239, 65 L. Ed. 2d at 95 (citation omitted).

Defendant Gaines did not object to this examination at trial; therefore, our review is limited to plain error. N.C. R. App. P. 10(c)(4). Assuming *arguendo* that the allowance of this cross-examination was error, defendant has not shown that the error in admitting the evidence was so fundamental as to constitute a miscarriage of justice or that the error was one which probably resulted in the jury reaching a verdict different from what it otherwise would have reached. *Collins*, 334 N.C. at 62, 431 S.E.2d at 193.

[11] Defendant Gaines also contends that the prosecutor's closing argument was improper in that the prosecutor used defendant's silence on 22 November to argue that defendant's accident defense at trial was an "after-the-fact fabrication." First, we note that defendant did not object to this portion of the closing argument. Where there is no objection, "the standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial." *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995). In view of the wide latitude

accorded counsel in closing argument and the substantial evidence against defendant, we cannot conclude that the argument at issue meets this test. These assignments of error are overruled.

[12] Defendant Gaines next contends the prosecutor "improperly attacked defense counsels['s] integrity and credibility" during the State's closing argument. Defendant contends the argument violated settled rules of court as well as defendant's state and federal constitutional right to the effective assistance of counsel.

Defendant specifically points to three arguments for which he contends the trial court erred in failing to intervene *ex mero motu*. First, defendant contends the prosecutor emphasized the fact that defense counsel vigorously cross-examined the motel clerk, Kevin Penegar, regarding his testimony that he had seen defendants and Coleman at the motel earlier the night of the shooting when the defense evidence had established the same fact. The prosecutor argued:

> So why cross examine Kevin Penegar like that if they knew that was true? You know why they did that? To confuse you. That's why. To confuse you. That's what they're doing. That's what they're up to.

Defendant next points to a portion of the closing argument where the prosecutor responded to an argument made by the defense, wherein defense counsel had argued that shotgun wadding, which was found three feet from the door, was found in that position because it had bounced off the victim, who was headed toward defendant at the door. In response to the argument, the prosecutor argued that the evidence showed that the wadding was found there because paramedic Keller had taken it out of the victim's chest and put it on the floor. The prosecutor then argued:

> So if you believe that [Keller] removed that wadding from inside the wound, then what Mr. Cooney said to you cannot be true. And when you decide which lawyer you're going to follow, you think about that. Because he s[a]t there and he heard Mr. Keller testify. But now he's making stuff up. Making stuff up. Don't believe it. Don't believe it. It stumbles and it falls.

Finally, defendant takes issue with the prosecutor's argument that "[t]he physical evidence does not lie in this case. Defendant Gaines' lawyers are trying to show you that it lies, but it doesn't."

Prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). In addition, the arguments of counsel are left largely to the control and discretion of the trial judge. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). In the instant case defendant did not object to the above arguments at trial. Thus, "the standard we employ is whether the statements amounted to such gross impropriety as to require the trial judge to act *ex mero motu*." *Oliver*, 309 N.C. at 356, 307 S.E.2d at 324. The prosecutor is entitled to argue any reasonable inference to be drawn from the evidence and to rebut defense counsel's argument. After reviewing the challenged statements in their context, we conclude that they were not grossly improper. This assignment of error is overruled.

[13] Finally, defendant Gaines contends that the trial court erroneously used the word "victim" when referring to Griffin throughout its jury instructions and erroneously instructed the jury that Griffin was "the victim." Defendant contends that these instructions were an improper expression of opinion in violation of N.C.G.S. §§ 15A-1222 and -1232 and the Fourteenth Amendment to the United States Constitution. This Court has addressed and rejected this argument in *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). This assignment of error is without merit.

## ISSUES RAISED BY DEFENDANT HARRIS

[14] Defendant Harris contends that the trial court erred in denying his motion to dismiss the charge of first-degree murder on the ground that the evidence was insufficient.

Defendant contends that the evidence was insufficient to show that he and Gaines were acting in concert. Defendant argues that the evidence was insufficient to show that he was present at the scene, that he did any of the acts, or that he shared a common plan with Gaines to kill Griffin. A defendant may be found guilty of committing a crime under the theory of acting in concert if he is present at the scene of the crime acting together with another person with whom he shares a common plan although the other person does all the acts necessary to carry out the crime. *State v. Abraham*, 338 N.C. 315, 451 S.E.2d 131 (1994). A defendant's presence at the scene may be either actual or constructive. *See Oliver*, 309 N.C. 326, 362, 307 S.E.2d 304, 327. A person is constructively present during the commission of a

crime if he is close enough to provide assistance if needed and to encourage the actual execution of the crime. *State v. Willis*, 332 N.C. 151, 175, 420 S.E.2d 158, 169 (1992).

In the instant case the evidence was conflicting as to defendant Harris' actual presence during the crime. The State's evidence of defendant's actual presence included the victim's dying identification of his killers and Sandy Bolton's testimony that immediately after she heard a gunshot, she saw three black men running from the area of the lobby out into the parking lot. Defendant presented evidence that he either remained at the car in the nearby State Farm parking lot or walked some distance with Gaines, although not all the way to the motel lobby. This evidence is sufficient to support a finding that defendant was either actually or constructively present at the time of the killing. The evidence also shows that defendant shared Gaines' plan to shoot the victim. When Gaines suggested that he wanted to "get" the victim, defendant encouraged and aided him. Defendant provided Gaines with a shotgun to commit the killing. Defendant then accompanied Gaines back to the motel, and the men parked in the parking lot of another business behind the motel. At this point defendant either remained at the automobile or accompanied Gaines as far as the motel parking lot. When Gaines returned after shooting the victim, defendant left with Gaines and Coleman. Defendant then took possession of the murder weapon and hid it. This evidence was sufficient to show that defendant and Gaines were acting in concert.

[15] Defendant Harris also contends that the evidence is insufficient to convict him of first-degree murder on the theory of aiding and abetting. The basis for this contention is lack of evidence of defendant's presence at the scene of the crime. As we have already discussed, the evidence amply supported the jury's finding that defendant was either actually or constructively present at the scene of the crime. Moreover, we also note that in *State v. Bond*, 345 N.C. 1, 23-24, 478 S.E.2d 163, 174 (1996), this Court, interpreting N.C.G.S. § 14-5.2, effective 1 July 1981 as to offenses committed after that date, held that actual or constructive presence is no longer required to prove a crime under an aiding and abetting theory. We now hold that to the extent our cases decided after N.C.G.S. § 14-5.2 became applicable suggest that actual or constructive presence is necessary to prove a crime under an aiding and abetting theory, these cases are no longer authoritative on this issue. *E.g., State v. Vanhoy*, 343 N.C. 476, 480, 471 S.E.2d 404, 407 (1996); *State v. Allen*, 339 N.C. 545, 558, 453 S.E.2d 150, 157 (1995); *State v. Hunt*, 323 N.C. 407, 424, 373 S.E.2d

STATE v. GAINES

[345 N.C. 647 (1997)]

400, 411 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990); State v. Belton, 318 N.C. 141, 150-51, 347 S.E.2d 755, 761 (1986); *State v. Rogers*, 316 N.C. 203, 229, 341 S.E.2d 713, 728 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Amerson*, 316 N.C. 161, 166-67, 340 S.E.2d 98, 101 (1986).

[16] We also reject defendant's contention that the evidence was insufficient to support his conviction under the "friend" exception to the mere presence rule. The evidence demonstrates that defendant encouraged and intended to assist Gaines, that Gaines knew of defendant's support and encouragement, and that defendant was not merely present. *See State v. Scott*, 289 N.C. 712, 722, 224 S.E.2d 185, 190 (1976).

[17] Defendant Harris further contends the evidence was insufficient to show that he had the requisite *mens rea* for the crime under either theory of accomplice liability. Defendant argues that the evidence that he provided the weapon used in the shooting and hid it afterward is not substantial evidence of the *mens rea* to commit first-degree murder. We do not agree.

Proof of premeditation and deliberation is proof of a specific intent to kill. *State v. Thomas*, 332 N.C. 544, 560, 423 S.E.2d 75, 84 (1992).

> Among the circumstances which may be considered as tending to show premeditation and deliberation are: (1) the want of provocation on the part of the victim, (2) the defendant's conduct and statements before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, (5) evidence that the killing was done in a brutal manner. The nature and number of the victim's wounds is also a circumstance from which an inference of premeditation and deliberation may be drawn.

*State v. Myers*, 309 N.C. 78, 84, 305 S.E.2d 506, 510 (1983) (citations omitted). In this case the evidence of defendant's conduct before and after the killing is sufficient to support a finding beyond a reasonable doubt that Harris acted with premeditation and deliberation.[1] This assignment of error is overruled.

---

1. In *State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997), a majority of this Court held that a finding that the accomplice individually possessed the *mens rea* to commit the crime is not necessary to convict a defendant of premeditated and deliberate murder under a theory of acting in concert.

**[18]** Defendant Harris also contends the trial court erred by erroneously instructing the jury that defendant did not have to be present at the scene of the crime in order to be convicted of a crime under the theory of aiding and abetting. After beginning its deliberations, the jury asked to be instructed on the definitions of acting in concert, aiding and abetting, friends, and scene of the crime. In response to this request, the trial court reinstructed the jury in part as follows:

> Now, as to aiding and abetting. A person may be guilty of the crime charged, in this case, murder in the first degree, or some lesser included offense, if the evidence gives rise to that, although he or they, as the case may be, personally does not or do not do any of the acts necessary to constitute that crime. In aiding and abetting, the State does not have to prove that the defendant who is being sought to be convicted under that theory that that defendant was present at the scene. But the State must prove three things beyond a reasonable doubt. If you find from the evidence, find from the evidence and beyond a reasonable doubt these three things, the aiding and abetting part of it would be satisfied.

> Acting in concert differs in that the State, if the State proves from the evidence beyond a reasonable doubt that the one against whom the theory of acting in concert is being asserted was at or, was at the scene of the crime, then acting in concert could be, could be used. Aiding and abetting does not require that proximity or nearness to the scene of the crime.

Defendant did not object to these instructions. He contends that by erroneously instructing the jury that defendant did not have to be present at the scene in order to be convicted of an offense under the theory of aiding and abetting, the trial court directed a verdict as to this element of the offense. Defendant further contends that the erroneous instruction violated his right to a trial by jury under the North Carolina Constitution.

Under *State v. Bond*, 345 N. C. at 24, 478 S.E.2d at 175, the trial court was not required to instruct on defendant Harris' presence or lack thereof.

Furthermore, since defendant did not object to these instructions, any review is limited to plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375. Only in a rare case will an improper instruction justify reversal of a criminal conviction when no objection was made at trial. *Allen*, 339 N.C. at 558, 453 S.E.2d at 157. To find plain error, "the error

in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or [one] which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *Collins*, 334 N.C. at 62, 431 S.E.2d at 193.

In the instant case the evidence indicates that if defendant was not actually present with Gaines when Gaines killed the victim, he was nearby. The record reveals substantial evidence of defendant's constructive presence at the scene of the crime. Therefore, the jury probably would not have reached a different verdict but for the trial court's instruction as to presence. This assignment of error is overruled.

[19] In another assignment of error, defendant Harris contends that the trial court erred in instructing the jury on the "friend" exception as part of the instruction on aiding and abetting. In instructing the jury on aiding and abetting, the trial court stated:

> However, a person is not guilty of a crime merely because he is present at the scene, even though he may silently approve of the crime or secretly intend to assist in its commission. To be guilty, he must aid or actively encourage the person committing the crime, or in some way communicate to this person his intention to assist in the commission of the crime. An exception to that is when the bystander, . . . alleged to be Bryan Harris under the current instructions, is a friend of the perpetrator, Allen Gaines, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as encouragement.

Defendant argues that a person's mere presence at the scene of the crime is not enough to show aiding and abetting.

The trial court's instructions were a correct statement of the law and were supported by the evidence. *See State v. Amerson*, 316 N.C. 161, 166-67, 340 S.E.2d 98, 101 (1986). Accordingly, this assignment of error is overruled.

[20] Defendant next argues that the trial court erred in failing to intervene *ex mero motu* to prohibit certain prosecutorial arguments. He first points to the prosecutor's argument that the victim's "gasp" drew motel clerk Kevin Penegar's attention to the victim's face and argues that there was no evidence that the "gasp" was what drew Penegar's attention to the victim. Second, defendant points to the prosecutor's arguments that after the victim was shot, the victim

STATE v. GAINES

[345 N.C. 647 (1997)]

looked out the window and saw defendant Harris and Coleman leaving their lookout positions. Defendant argues that there was no evidence to support the inference that the victim saw Harris and Coleman coming out of positions of hiding or that Harris and Coleman were lookouts. Third, defendant points to the prosecutor's argument that Gaines fled with the shotgun stuck up under his coat, hiding the gun, and that Coleman and Harris came out of their "lookout" positions and ran out of the parking lot. Fourth, defendant points to the argument that the three men went to the fence near the La Quinta Inn as quickly as possible to get to their getaway vehicle. Fifth, defendant points to the prosecutor's argument that "something put it into Officer Griffin's mind" that these three men were dangerous, as evidenced by the fact that Griffin got their license-tag number. Sixth, and finally, defendant argues that the prosecutor misstated the law by arguing that when defendant took the gun and hid it, that constituted acting in concert, aiding and abetting, and first-degree murder.

We first note that defense counsel did not object to these six arguments at trial. Counsel is given wide latitude in the argument of hotly contested cases and may argue all the facts in evidence and any reasonable inferences that can be drawn therefrom. *Williams*, 317 N.C. 474, 346 S.E.2d 405. In the absence of any objection at trial to a jury argument, the standard of review to determine if the trial court erred by not intervening *ex mero motu* is whether the prosecutor's argument was so grossly improper that it interfered with defendant's right to a fair trial. *State v. Sexton*, 336 N.C. 321, 362, 444 S.E.2d 879, 902, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). In the instant case a review of the arguments in context reveals that the prosecutor's arguments were not so grossly improper as to require the trial court to intervene *ex mero motu*. This assignment of error is overruled.

[21] Defendant next contends the trial court erred in denying defendant Gaines' motion for a jury view, which defendant Harris joined. This contention is without merit. The decision to grant a motion for a jury view is within the discretion of the trial court. *State v. Simpson*, 327 N.C. 178, 393 S.E.2d 771 (1990). In the instant case the trial court denied the motion on the grounds that the photographs and the measurements submitted by the parties were sufficient to enable the jury to reconstruct the scene and circumstances of the crime. The trial judge did not abuse his discretion by denying the request for a jury view, and this assignment of error is overruled.

**[22]** Defendant next argues that the trial court erred in instructing the jury that defendant had confessed to some of the acts charged. The trial court instructed the jury, over defendant's objection, as follows:

> [T]here is evidence which tends to show that the Defendant Gaines and/or the Defendant Harris made a statement that purports to confess to some of the acts or the acts charged in these cases. And if you find that the Defendant Gaines and/or the Defendant Harris made a statement or a confession, if you find it to be that, to that extent, or to the extent that some of the acts have been confessed to that they are charged, each and/or both of them are charged with in these cases, then you should consider all the circumstances under which those statements were made in determining whether or not they were truthful confessions as they apply to those two defendants individually and respectively, and the weight that you would give to them.

Defendant contends that, although his statement may have been inculpatory, it did not amount to a confession.

This Court has defined a confession as "an acknowledgement in express words by the accused in a criminal case of his guilt of the crime charged or of some essential part of it." *State v. Fox*, 277 N.C. 1, 25, 175 S.E.2d 561, 576 (1970). Defendant gave two statements to Boothe, the facts of which include the following. On 21 November 1991 defendant was with Gaines and Coleman and went to the Red Roof Inn to visit Anthony Williams. Gaines was driving. The group ascertained Williams' room number and started to locate the room. The victim asked the men where they were going, and when they responded, the victim told them they could not all go to the room. Gaines and the victim began to argue, and the victim grabbed Gaines by the collar, picked him up off the ground, and told him to leave. The victim also told defendant to leave. The three men left the motel and went to the residence of Sandra Carrington. Defendant went into Carrington's residence and retrieved a shotgun which he had previously left at Carrington's apartment. The three men then drove back to a parking lot near the motel and got out of the automobile. Gaines walked to the motel, and defendant and Coleman stood by the automobile. Defendant heard a gunshot, and Gaines came running back to the automobile. The men quickly drove away from the motel and went back to defendant's house. Defendant took the shotgun and put it under his house.

Defendant was found guilty of first-degree murder not as the perpetrator of the shooting, but rather, on the theory that he encouraged, aided, and assisted Gaines in the perpetration of the shooting. Accordingly, any confession by him would necessarily relate to those acts by which he so encouraged Gaines. Defendant's statement amounts to a confession to acts which constitute his guilt of aiding and abetting or of acting in concert with Gaines.

[23] Finally, defendant contends that the instruction amounted to an improper expression of opinion on the evidence in violation of N.C.G.S. §§ 15A-1222 and -1232. This issue was previously decided against defendant's position in *State v. Cannon*, 341 N.C. 79, 459 S.E.2d 238 (1995). This assignment of error is overruled.

[24] Defendant also contends he is entitled to a new trial because the jury found him guilty of first-degree murder but "inconsistently" found on the Issues and Recommendation as to Punishment form that he did not have the specific intent to kill the victim.

In *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982), the United States Supreme Court held that before the death penalty may be imposed on a defendant who is found guilty of first-degree murder under the felony-murder rule on the ground that he was an aider and abettor to the underlying felony, the sentencer must first find that the defendant killed, attempted to kill, intended to kill, or contemplated that life would be taken. *Id.* at 801, 73 L. Ed. 2d at 1154.

The *Enmund* rule does not apply to a defendant who has been found guilty of first-degree murder based on premeditation and deliberation. Because defendant was convicted of first-degree murder based on premeditation and deliberation, and not based on the felony-murder rule, Issue One-A is inapplicable. The issue on the form asked the jury whether it found that defendant "himself intended to kill the victim." The jury answered "no" to this question but was not asked to indicate whether it believed defendant intended for the victim to be killed or contemplated that life would be taken. In the guilt-innocence phase, the jury found defendant guilty of premeditated and deliberate murder either under the theory of acting in concert or by aiding and abetting. This verdict is not inconsistent with the jury's later indication that defendant did not himself intend to kill the victim as no evidence suggested that Harris personally intended to inflict the fatal wound himself. Moreover, even if it be assumed that the verdicts were inconsistent, having determined

FAULKENBURY v. TEACHERS' AND STATE EMPLOYEES' RET. SYS.

[345 N.C. 683 (1997)]

that the evidence of *mens rea* was sufficient for the jury to find defendant guilty beyond a reasonable doubt on either or both theories of accomplice liability, we do not review the verdicts on the ground of inconsistency. *See State v. Reid*, 335 N.C. 647, 656-61, 440 S.E.2d 776, 781-83 (1994). This assignment of error is overruled.

For the foregoing reasons we conclude that defendants received a fair trial free from prejudicial error.

NO ERROR.